# EXHIBIT B

1
2
3
4
5
6
7
8
9
10

SPENCER HOSIE (CA Bar No. 101777)
shosie@hosielaw.com
DIANE S. RICE (CA Bar No. 118303)
drice@hosielaw.com
LYNDSEY C. HEATON (CA Bar No. 262883)
lheaton@hosielaw.com
DARRELL R. ATKINSON (CA Bar No. 280564)
datkinson@hosielaw.com
BRANDON C. MARTIN (CA Bar No. 269624)
bmartin@hosielaw.com
HOSIE RICE LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111
(415) 247-6000 Tel.
(415) 247-6001 Fax
*Attorneys for Plaintiff LookSmart Group, Inc.*

11

Additional attorneys listed on signature page.

12
13
14

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

15
16
17
18
19
20
21
22
23
24
25
26
27
28

| | |
|---|---|
| LOOKSMART GROUP, INC.,<br><br>                                    Plaintiff,<br><br>v.<br><br>MICROSOFT CORPORATION<br><br>                                    Defendant. | Case No.:  3:17-cv-04709-JST<br><br>**PLAINTIFF's PATENT L.R. 3-8 DISCLOSURE**<br><br>**DEMAND FOR JURY TRIAL** |

## I.   INTRODUCTION

Pursuant to Patent L.R. 3-8, Plaintiff LookSmart Group, Inc. ("LookSmart" or "Plaintiff") hereby serves its Damages Contentions ("Contentions") on Defendant Microsoft Corporation ("Microsoft" or "Defendant"). These Contentions are made solely for the purposes of this action and are preliminary in nature as discussed below.

These Contentions relate to United States Patent No. 7,356,530 ("the '530 Patent" or the "Patent-in-Suit"). Plaintiff bases these Contentions on its current knowledge, understanding, and belief as to the facts and information available as of the date of these Contentions. This case is still in the early stages of discovery. Plaintiff has not yet completed its investigation, collection of information, discovery, or analysis related to this action. Accordingly, Plaintiff reserves the right to supplement, amend, or modify the information set forth below. In particular, Plaintiff reserves its right to amend and supplement its damages theories as further discovery is taken, and as Microsoft provides additional details about the accused Bing products, activities, projections, and financials, all as assessed by LookSmart's damages expert.

## II.   POTENTIAL DAMAGES THEORIES

LookSmart asserts one patent against Microsoft—the '530 Patent.  The '530 Patent claims functionality essential to Bing. The implicated Bing functionality is set forth in detail in LookSmart's Amended Infringement Contentions.

As a matter of law, if the patent at issue is found valid, enforceable, and infringed, then the patent owner is entitled to "damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court." 35 U.S.C. § 284.

There are different methodologies for calculating reasonable royalties which may be applicable to damages in this matter, namely, a *Georgia-Pacific* approach, an "analytical" approach, a cost saving approach, and a comparables approach.

LookSmart anticipates that its expert's determination of reasonable royalty damages under one of these approaches will be based on, among other things, analysis of sales and profit projections, analyst forecasts, profitability information and other documents and records produced by LookSmart, Microsoft, and third parties. LookSmart's expert may also use other documents and materials referred to and recognized as relevant to the determination of a reasonable royalty or other damages computations.

As a matter of economics, a reasonable royalty is the expected outcome of a licensing negotiation between the infringer and the patent owner, had the two parties negotiated a license for the infringer's right to practice the patent prior to the first act of infringement. As a legal matter, the negotiation is hypothesized to take place on the eve of first infringement and both parties are assumed to believe that the patent is valid and will be infringed by the licensee. The period for calculating damages is assumed to start on the hypothetical negotiation date and end on the date of the last infringing sale. Identification of the date informs the damage calculation, as the quantum of damages depend on the extent of the damage period.

This hypothetical negotiation is assumed to take place in the so-called "but-for world," where Microsoft is assumed not to infringe the Patent-in-Suit, but instead license its use from LookSmart. As such, the hypothetical negotiation is designed to mimic a real-world licensing negotiation that both parties might willingly enter under the assumption and with the understanding that the Patent-in-Suit is valid and, absent a license, would be infringed by Microsoft's Bing search engine.

Properly constructed, the hypothetical negotiation reflects the relevant expectations and market factors that would have affected a real-world licensing negotiation at the time of first infringement. To the extent possible, the parties' positions at this negotiation are based on their actual expectations at that time. Where such information about the parties' expectations is not available, it may be reasonable to assume that the actual marketplace outcomes are a proxy for the parties' expectations about those outcomes at the time of the

hypothetical negotiation. For the reasonable royalty to adequately compensate for the infringement, the so-called "book of wisdom" doctrine may be appropriate in this case, depending on the date of the hypothetical negotiation, to make the parties aware of the state of the market and the scope of infringement at the time of actual infringement. District courts and the Federal Circuit have found that a finder of fact "may consider facts and events that occurred after the alleged infringement began, even though they would not have been known to the parties at the time of the hypothetical negotiation." *Maxwell v. J Baker, Inc.*, 86 F3d 1098, 1109 (Fed. Cir. 1996).

In this case, the negotiation date would be the date when Microsoft's Bing search engine first began infringing the '530 Patent. As the '530 Patent did not issue until April 8, 2008, the negotiation logically must have occurred after Spring 2008. LookSmart's investigation into when Microsoft's infringement began is still ongoing.

### A. Defendant's Willingness to Pay

The amount that the Defendant would be willing to pay for a license to the Patent-in-Suit may take into consideration the incremental profits associated with the patented invention, namely, the profits associated with the sales of the infringing products or services (also taking into account the concept of the smallest saleable unit). In addition, the cost of the Defendant's next best alternative that avoids infringement of the Patent-in-Suit, which the Defendant did not pursue, may also be considered.

### B. LookSmart's Willingness to Accept

The amount that LookSmart would be willing to accept to provide a license to the Patent-in-Suit may take into consideration numerous factors (discussed further below), including the licensing of any other comparable patents.

### C. Various Analyses Applied

There are several approaches to calculating a reasonable royalty that fit within the general *Georgia-Pacific* framework. Because further discovery is required to ascertain adequate information and data to calculate a reasonable royalty, several potentially relevant approaches are described below:

1. _Primary Analyses – Royalties Consistent with Vringo Adjudicated Rate_

Existing licenses and royalty rates for comparable patents can inform a reasonable royalty in real-life royalty negotiations and in the determination of reasonable royalty damages in litigation.  One such comparable royalty can be found by analyzing the _I/P Engine, Inc. (Vringo) v. Google et al._ case.

In September 2011, I/P Engine filed a complaint for patent infringement against Google (among others) alleging infringement of two patents directed to search engine systems and methods that incorporate a filtering technology to provide improved search results: (1) U.S. 6,314,420 – "Collaborative/Adaptive Search Engine"; and (2) U.S. 6,775,664 – "Information Filter System and Method for Integrated Content-Based and Collaborative/Adaptive Feedback Queries."  At trial in November 2012, I/P Engine was awarded $30 million in damages based on a 3.5% royalty rate.  I/P Engine asked the Court for an award of post-judgement royalties due to Google's alleged continued infringement (although Google claimed to have designed around the patents prior to the jury verdict).  In January 2014, the Court adjudicated **a running royalty rate of 1.36% of Google AdWords revenues.**  The royalty rate constitutes a rate of 6.5% applied to an apportioned royalty base of 20.9% of AdWords revenue.[1]  Case No. 2:11-cv-00512 (Jan. 3 2014) (Dkt. No. 1081 at 3). In reaching the 6.5% rate, the Court increased the jury verdict rate by 40% to account for the fact that Google was a willful infringer post-verdict.  (Dkt. No. 1088 at 1).

Using a 1.3% royalty rate from _Vringo_, the nominal royalties based on Bing search advertising revenue, as understood from public information, amount to about $575 Million through the expiration of the '530 Patent.

---

[1] On appeal, the asserted patents were invalidated on the grounds of obviousness, but the Federal Circuit did not address damages. _I/P Engine, Inc. v. AOL Inc._, 576 F. App'x 982 (Fed. Cir. 2014).

| | Pre-Complaint FY'11 - '17 | Lit. Period FY'18 - '20 | '530 Expiration FY'21 - 4/15/21 | Total |
|---|---|---|---|---|
| Bing Search Adv. Revenue | $19,796,430,935 | $18,937,767,739 | $5,532,533,920 | $44,266,732,594 |
| Nominal Royalties | $257,353,602 | $246,190,981 | $71,922,941 | $575,467,524 |

The above analysis is based on the following assumptions:

- The complaint was filed in summer 2017 and settlement/trial is expected around June 30, 2020.  *See* ECF Nos. 36, 45.

- 11.1% growth rate for 2016-2020 search advertising revenue based on a PWC study. *See* http://www.pwc.com/gx/en/industries/entertainmentmedia/outlook/segmentinsights/internetadvertising.html

- 85% of Bing search revenues are U.S.-based.  *See* Google vs. Bing? Which One are Your Customers Using? (https://www.aborg.com/2014/08/google-vs-bing-which-one-are-your-customers-using/)

- Royalty rate of 1.3%

- The "Bing Search Advertising Revenues" set forth in the box above were generated from publicly available information.  Looksmart is in the process of reviewing the financial information produced by Microsoft last month. *See* MSL_0097160-MSL-0097330; MSL_0099223-MSL_0101356. Further discovery is necessary to fully understand the produced information. In any event, the above analysis sets forth the damages methodology.

2. *Supplemental Analysis – Incremental Profit Attributable to 500ms Search Latency Improvement.*

Incremental revenues and profits can also inform a reasonable royalty in real-life royalty negotiations and in the determination of reasonable royalty damages in litigation.

The '530 Patent provides improvements to search latency, which in turn provide increased revenues and profits to Microsoft.  The below incremental revenues and profits are attributable to 500 milliseconds in search latency improvement.

| | Pre-Complaint FY'11 - '17 | Lit. Period FY'18 - '20 | '530 Expiration FY'21 - 4/15/21 | Total |
|---|---|---|---|---|
| Bing Search Adv. Revenue | $19,796,430,935 | $18,937,767,739 | $5,532,533,920 | $44,266,732,594 |
| Incremental Revenue | $237,557,171 | $227,253,213 | $66,390,407 | $531,200,791 |
| Incremental Profit | $187,670,165 | $179,530,038 | $52,448,422 | $419,648,625 |

The above analysis is based on the following assumptions:

- The complaint was filed in summer 2017 and settlement/trial is expected around June 30, 2020. *See* ECF Nos. 36, 45.

- 11.1% growth rate for 2016-2020 search advertising revenue based on PWC study. *See* http://www.pwc.com/gx/en/industries/entertainmentmedia/outlook/segmentinsights/internetadvertising.html

- 85% of Bing search revenues are U.S.-based.

- 1.2% incremental revenue attributable to a 500 millisecond improvement in search latency. *See Performance Related Changes and Their User Impact* (Schurman and Brutlag) (Slide 4). LookSmart0018312-18324.

- Traffic acquisition costs of approximately 21% of revenue (using Google as a proxy).

- The "Bing Search Advertising Revenues" set forth in the box above were generated from publicly available information. Looksmart is in the process of reviewing the financial information produced by Microsoft last month. *See* MSL_0097160-MSL-0097330; MSL_0099223-MSL_0101356. Further discovery is necessary to fully understand the produced information. In any event, the above analysis sets for the damages methodology.

To calculate the incremental revenues and profits, it may be necessary to measure the incremental benefits afforded by the '530 Patent. There are various ways to approach such a measurement, including by: (a) comparing the search algorithm technology acquired through the Microsoft/Yahoo search arrangements vis-à-vis Yahoo's legacy search algorithm technology; (b) comparing the Yahoo Click-Through-Rate (CTR) before and after the Microsoft/Yahoo search arrangement; and (c) using Microsoft's own search latency trials.

a.  Comparison of the search algorithm technology acquired through the Microsoft / Yahoo search arrangements vis-à-vis Yahoo's legacy search algorithm technology

Incremental benefits can be determined by comparing the search algorithm technology acquired through the Microsoft / Yahoo search arrangements vis-à-vis Yahoo's legacy search algorithm technology.

In December 2009, Yahoo and Microsoft entered a Search and Advertising Sales Agreement.  Microsoft was the exclusive algorithmic and paid search services provider to Yahoo on personal computers (non-exclusive on mobile).  Per the original agreement, on revenue share, Yahoo paid Microsoft 12% of revenue generated from Microsoft's services on Yahoo properties and affiliate sites after deduction of the affiliate's share of revenue.

In April 2015, Yahoo and Microsoft amended the Agreement such that Microsoft is a *non-exclusive* provider of algorithmic and paid search services.  Per the revenue share, Yahoo pays Microsoft 7% of revenue generated from Microsoft's services on Yahoo properties and affiliate sites *before* deduction of the affiliate's share of revenue. *See* Yahoo 10-K for the fiscal year ending December 31, 2015.

As a starting point in the incremental benefits calculation, apportionments that may need to be applied to the Microsoft / Yahoo rates (12% and/or 7%) include:

- Reduction in Yahoo's expenditures for continued search engine development;

- Reduction in Yahoo's expenditures for search engine maintenance;

- Reduction in other operating expenses (*e.g.*, TAC or Traffic Acquisition Costs); and

- Apportionment due to other technical features (not related to subject-patent) of Microsoft Bing search engine versus Yahoo legacy search engine.

The following example shows one approach to calculating the Incremental Value of Microsoft Bing Search Engine Speed and Accuracy over Yahoo! Legacy Search Engine:



Such an analysis may involve a technical and economic assessment of Yahoo legacy search engine technologies beyond the scope of this disclosure. Further, such an analysis may require a detailed analysis of cost savings Yahoo achieved as a result of the Microsoft / Yahoo search arrangement.  Moreover, an analysis may require an assessment of royalty-base apportionments to account for the extent of infringing use.

b.   Comparison of Yahoo Click-Through-Rate (CTR) before and after Microsoft / Yahoo search arrangement

Incremental benefits can also be determined by comparing the Yahoo click-through-rate before and after the Microsoft / Yahoo search arrangement.  This analysis may involve testimony from an industry/market expert to assess and compare some measure of baseline CTR with the subject Microsoft Bing CTR.  This analysis may also involve potential market survey analysis.

Publicly available search advertising studies show that, prior to employing the Microsoft Bing search engine, Yahoo's CTR was approximately 40% of Microsoft's.

This equates to a CTR for Yahoo's legacy search engine of approximately .40%. Marin Software studied the impact of the "Search Alliance" between Microsoft and Yahoo. They found that, after the Search Alliance transition (October 2010), Yahoo+Bing CTR increased and ranged from .90% - 1.04%.  This translates to an incremental CTR of at least .50% (more than doubling of CTR).

c.     Microsoft Search Latency Trials

Incremental benefits can also be determined by using Microsoft's own search latency trials.

Per Microsoft documentation, Microsoft conducted search latency trials to determine the impact latency has on user behavior.  *See Performance Related Changes and Their User Impact*.

With respect to revenue, the trials found that (Slide 4):

- 500 millisecond delay:  1.2% reduction in revenue per user

- 1,000 millisecond delay:  2.8% reduction in revenue per user

- 2,000 millisecond delay:  4.3% reduction in revenue per user

With respect to queries, the trials found that (Slide 4):

- 500 millisecond delay:  no statistically significant change in distinct queries per user

- 1,000 millisecond delay:  0.7% reduction in distinct queries per user

- 2,000 millisecond delay:  1.8% reduction in distinct queries per user

With respect to satisfaction, the trials found that:

- 500 millisecond delay:  0.9% reduction in satisfaction

- 1,000 millisecond delay:  1.6% reduction in satisfaction

- 2,000 millisecond delay:  3.8% reduction in satisfaction

### 3. *Other Royalty Rate Factors that May be Relevant:*

A reasonable royalty for the Patent-in-Suit, informed by the relevant bargaining range outlined above, would have resulted from a hypothetical negotiation between LookSmart and Microsoft.  A reasonable royalty for Microsoft's infringement is typically determined by consideration of the *Georgia-Pacific* factors.

> a.  Royalties Received by the Patentee for the Licensing of the Patent-in-Suit

LookSmart has not entered into any license or settlement agreement covering the patent-in-suit with third parties.

> b.  Rates Paid by Microsoft for use of Comparable Patents

LookSmart is conducting discovery on Microsoft's licensing history. To the extent relevant, such evidence will be part of the damage model.

> c.  The Nature and Scope of the License

Discovery is still ongoing and determination of this factor will depend on information provided by Microsoft.  Notwithstanding, the *Vringo* license and other Microsoft patent licenses may be instructive of the nature and scope of the license resulting from a hypothetical negotiation between LookSmart and Microsoft.

> d.  The Commercial Relationship between Licensor and the Licensee.

LookSmart, like Microsoft, offers internet services.  Indeed, LookSmart and Microsoft had a prior relationship.  LookSmart would likely not be willing to license its technology to an entity in the same space, especially one as well-funded as Microsoft, without receiving a sizeable royalty in return to compensate it for the potential foregone revenue resulting from such a license.  Documents related to Bing's efforts to market, sell, or distribute Bing should be reviewed to comprehensively analyze this factor. Discovery is still ongoing and determination of this factor will depend on information provided by Microsoft.

e.     Effect of Selling Patented Specialty in Promoting Sales of Other Products of the Licensee

LookSmart expects that Microsoft's Bing search engine promotes sales of additional products and services that, while not themselves infringing, are directly tied to the infringing product. Discovery is still ongoing and determination of this factor will depend on information provided by Microsoft.

f.     The Duration of the Patent and Term of the License.

The Patent-in-Suit expires in 2021.  The term of the hypothetical license would start on the date of the hypothetical negotiation. Further discovery from Microsoft is necessary to determine the dates of the hypothetical negotiations and thus, the duration of the license.

g.     Established Profitability of the Product Made under the Patent

Microsoft's profitability of the infringing Bing search engine will inform the damages analysis.  Further discovery from Microsoft is necessary to determine that established profitability.

h.     The Utility and Advantages of the Patented Property Over Old Modes or Devices

As set forth in the declaration of  Dr. Pazzani, the '530 Patent discloses and claims multiple improvements over prior systems, including providing improved relevancy rankings for web pages and generating such rankings in a timely manner. *See* ECF No. 1-4 at ¶¶ 31–44. These improved rankings do not sacrifice speed and are accomplished in several ways that are not disclosed in prior systems. Dr. Pazzani has stated that the '530 Patent improves the extrinsic ranking by examining linking pages and considering both their anchor weights (e.g., by examining the text associated with outbound hypertext links) and page weights. As a further improvement to the extrinsic ranking, for a particular linking page, the anchor weight is adjusted by the page weight. A still further improvement in the relevancy rankings includes combining the improved extrinsic ranking with an intrinsic ranking that considers both a content score for the page at issue

1    and the page weight of that page, while also adjusting the content score by the page

2    weight. Dr. Pazzani has further stated that in addition to the exemplary improvements in

3    relevancy rankings, the '530 Patent reduces the time required to rank results in response

4    to search queries by associating the intrinsic and extrinsic ranking factors with keywords

5    of each web page indexed in a searchable data structure.

6          Dr. Pazzani also stated that to address the speed with which reliable search results

7    are produced, the '530 Patent combines enhanced relevancy rankings with a pre-built

8    index to store information for rapidly providing quality search results. Such stored

9    information can (but does not necessarily) include keywords associated with a web page

10   along with values related to the page's intrinsic ranking, extrinsic ranking, and

11   importance.

12         In addition, Microsoft has filed many patent applications of its own in the search

13   space. Those Microsoft patent applications may bear on the importance of the technology

14   at issue.

15         Discovery is still ongoing and determination of this factor will depend on

16   information provided by Microsoft.

17                         i.    The Nature of the Patented Invention

18         The invention patented by the '530 Patent relates to search engine technology and

19   improvements thereto.

20                         j.    The Extent to Which the Infringer Has Made Use of the
21                               Invention

22         Microsoft's Bing search engine has made extensive use of the '530 Patent.  Further

23   discovery from Microsoft is necessary to determine the exact contours of that infringing

24   use.

25                         k.    The Portion of Profit that may be Customary to Allow for the
26                               Use of the Invention

27         Due to the importance of the '530 Patent and the relationship between the parties,

28   LookSmart expects that the portion of Microsoft's profit from Bing due to its use of the

'530 Patent will be substantial.   Further discovery from Microsoft is necessary to determine additional facts that weigh on this factor. In addition, Looksmart expects that third party licenses, including their royalty rates, may bear on this factor.   Additional discovery on such licenses is necessary.

> l.     The Portion of Realizable Profit That Should be Credited to the Invention

Due to the importance of the '530 Patent and the relationship between the parties, LookSmart expects that the portion of Microsoft's profit from Bing that should be credited to the invention of the '530 Patent will be substantial.   Further discovery from Microsoft is necessary to determine additional facts that weigh on this factor.

> m.    The Opinion Testimony of Qualified Testimony

The opinions of technical experts are necessary to provide technical knowledge, background, and assumptions that will be used to supplement and guide any analyses of damages.   LookSmart's technical experts are reviewing the accused Bing search engine, and their analysis will guide the damages analysis.   Discovery is still ongoing and determination of this factor will depend on information provided by Microsoft.

> n.     The Amount That a Licensor Would Have Agreed Upon if Both Had Been Reasonably and Voluntarily Trying to Reach an Agreement.

A starting point for the determination of a reasonable royalty is an assessment of the expected costs and benefits to each of the relevant parties as a result of the license envisioned in the hypothetical negotiation. The benefits to the licensor of granting a license are the royalty payments that it can expect to receive from the licensee. The costs to the licensor of granting the license may include, for example, the expected costs associated with facing a stronger competitor or additional competitors in the marketplace, costs associated with lost licensing opportunities or the effect of this license on other potential license negotiations, and other costs of licensing.

The costs to the licensee of taking a license are the royalty payments that it must make in exchange for the right to practice the patented technology. The benefits to the licensee are the additional profits it expects to earn by using the patented technology as compared, for example, to the expected profits- and in particular, the full economic costs-associated with developing, relying on, and using the next-best, practically available, non-infringing alternative, to the extent that one is available.

## III.   OUTSTANDING DAMAGES DISCOVERY

LookSmart has propounded  damages discovery through Interrogatories and Requests for Production seeking information LookSmart needs to complete its Patent L.R. 3-8 disclosure.  By way of example, documents LookSmart seeks that relate to Bing include:

- RFP No. 16 (patent policies including licensing)
- RFP No. 17 (methodologies used for determining value or royalty rates)
- RFP No. 19 (design-around documentation)
- RFP No. 22 (patent licenses)
- RFP No. 23 (advertising material)
- RFP No. 29 (sales and revenue information)
- RFP No. 30 (revenue from related services)
- RFP No. 31 (gross, contribution, operating profit information)
- RFP No. 32 (marketing information)
- RFP No. 33 (market share information)
- RFP No. 34 (licensing plans)
- RFP No. 35 (customer demand information)
- RFP No. 36 (customer survey information)
- RFP No. 39 (annual reports)

- RFP No. 40 (documents reflecting typical royalty rates)

- Interrogatory No. 6 (seeking revenues)

- Interrogatory No. 7 (seeking web-based search patents)

- Interrogatory No. 8 (seeking licenses in the web-based search field)

Respectfully Submitted,

Dated: May 22, 2018          By: */s/ Leslie V. Payne*

SPENCER HOSIE (CA Bar No. 101777)
shosie@hosielaw.com
DIANE S. RICE (CA Bar No. 118303)
drice@hosielaw.com
LYNDSEY C. HEATON (CA Bar No. 262883)
lheaton@hosielaw.com
DARRELL R. ATKINSON (CA Bar No. 280564)
datkinson@hosielaw.com
BRANDON C. MARTIN (CA Bar No. 269624)
bmartin@hosielaw.com
**Hosie Rice LLP**
600 Montgomery Street, 34th Floor San Francisco,
CA 94111
Telephone: (415) 247-6000
Facsimile: (415) 247-6001

Leslie V. Payne
TX State Bar No. 00784736 (*pro hac vice*)
lpayne@hpcllp.com
Eric J. Enger
TX State Bar No. 24045833 (*pro hac vice*)
eenger@hpcllp.com
R. Allan Bullwinkel
TX State Bar No. 24064327 (*pro hac vice*)
abullwinkel@hpcllp.com
Christopher L. Limbacher
TX State Bar No. 24102097 (*pro hac vice*)
climbacher@hpcllp.com
**HEIM, PAYNE & CHORUSH, LLP**
1111 Bagby St. Ste. 2100
Houston, Texas 77002
Telephone: (713) 221-2000
Facsimile: (713) 221-2021

Derek Gilliland
TX State Bar No. 24007239 (*pro hac vice*)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

dgilliland@nixlawfirm.com
**NIX PATTERSON & ROACH, L.L.P.**
205 Linda Drive
Daingerfield, TX 75638
Telephone: (903) 645-7333
Facsimile: (903) 645-5389

**ATTORNEYS FOR LOOKSMART GROUP, INC.**

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 22, 2018, I served via email Plaintiff's Patent L.R. 3-8 Disclosures on the following:

| | |
|---|---|
| Juanita R. Brooks (SBN 75934 / brooks@fr.com) Jason W. Wolff (SBN 215819 / wolff@fr.com) FISH & RICHARDSON P.C. 12390 El Camino Real San *Diego, CA 92130* *Telephone: (858) 678-5070* *Facsimile: (858) 678-5099* | Betty H. Chen (SBN 290588 / bchen@fr.com) Andrew M. Goldberg (SBN 307254 / goldberg@fr.com) FISH & RICHARDSON P.C. 500 Arguello Street, Suite 500 Redwood City, California 94063 Telephone: (650) 839-5070 Facsimile: (650) 839-5071 |

By:   */s/ Leslie V. Payne*
      Leslie V. Payne