SPENCER HOSIE (CA Bar No. 101777)
shosie@hosielaw.com
DIANE S. RICE (CA Bar No. 118303)
drice@hosielaw.com
BRANDON C. MARTIN (CA Bar No. 269624)
bmartin@hosielaw.com
HOSIE RICE LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111
(415) 247-6000 Tel.
(415) 247-6001 Fax
*Attorneys for Plaintiff Looksmart Group, Inc.*

Additional attorneys listed on signature page.

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| LOOKSMART GROUP, INC.,<br><br>Plaintiff,<br><br><br>v.<br><br><br><br>MICROSOFT CORPORATION<br>Defendant. | Case No.:  3:17-cv-04709-JST<br><br>**PLAINTIFF LOOKSMART GROUP, INC.'S RESPONSE AND OPPOSITION TO MICROSOFT CORPORATION'S MOTION TO EXCLUDE THE TESTIMONY OF LOOKSMART'S DAMAGES EXPERT, MICHAEL J. LASKINSKI**<br><br>Date: July 11, 2019<br>Time: 2:00 pm<br>Place: San Francisco, Courtroom #9, 19th Fl.<br>Judge: Hon. Jon S. Tiger |

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................ 1

II.     THE CONTROLLING LAW CONFIRMS THE SOUNDNESS OF MR. LASINSKI'S

        METHODOLOGY ............................................................................................ 2

III.    ARGUMENT .................................................................................................... 4

        A.      Microsoft Misstates Mr. Lasinski's Opinion ............................... 4

        B.      Mr. Lasinski's "Real" Opinion: The Cost Approach ................... 4

                1.      Mr. Lasinski's Cost Approach ......................................... 5

                2.      Mr. Lasinski's Application of a "Discount Rate" ............... 7

                3.      Mr. Lasinski's Analysis of the *Georgia Pacific* Factors.................. 10

        C.      Microsoft's Claim That Mr. Lasinski Failed to Apportion The Time Value

                of Money from Rate of Return Is Meritless ................................ 16

IV.     CONCLUSION ............................................................................................... 16

LOOKSMART'S RESPONSE AND OPPOSITION TO MOTION                    Case No. 17-CV-04709-JST
TO EXCLUDE THE TESTIMONY OF DAMAGES EXPERT

# TABLE OF AUTHORITIES

**Cases**

*Apple Inc. v. Motorola, Inc.*
   757 F.3d 1286 (Fed. Cir. 2014)..................................................................................2

*Hanson v. Alpine Valley Ski Area, Inc.*
   718 F.2d 1075 (Fed.Cir.1983)....................................................................................3

*i4i Ltd. P'ship v. Microsoft Corp.*
   598 F.3d 831 (Fed. Cir. 2010)...................................................................................17

*Lucent Technologies, Inc. v. Gateway, Inc.*
   580 F.3d 1301 (Fed. Cir. 2009)..................................................................................7

*Mars, Inc. v. Coin Acceptors, Inc.*
   527 F.3d 1359 (Fed. Cir. 2008)..................................................................................3

*Micro Chemical, Inc. v. Lextron, Inc.*
   317 F.3d 1387 (Fed. Cir. 2003)................................................................................17

*Open Text S.A. v. Box, Inc.*
   2015 WL 393858 (N.D. Cal. Jan. 29, 2015) ..............................................................3

*Powell v. Home Depot U.S.A., Inc.*
   663 F.3d 1221 (Fed. Cir. 2011)..................................................................................3

*Prism Techs. LLC v. Sprint Spectrum L.P.*
   849 F.3d 1360 (Fed. Cir. 2017)..................................................................................6

*Whitserve, LLC v. Computer Packages, Inc.*
   694 F.3d 10 (Fed. Cir. 2012)......................................................................................3

LOOKSMART'S RESPONSE AND OPPOSITION TO MOTION                    Case No. 17-CV-04709-JST
TO EXCLUDE THE TESTIMONY OF DAMAGES EXPERT

# I.    INTRODUCTION

Microsoft evidently wishes Mr. Lasinski had written a report quite unlike the one he actually wrote.   Its *Daubert* challenge inexplicably says that Mr. Lasinski used a "royalty base" that he multiplied by a "royalty rate" to calculate a reasonable royalty of roughly $36 million. But he did no such thing—he did not use a "base times rate" approach. Microsoft then argues that the "rate" is "arbitrary" and exceedingly high at "88 percent." This is the strawman that Microsoft erects and then spends 11 pages attacking.

Instead of using the "revenue approach" to calculate a royalty, which often employs the "base times rate" paradigm, Mr. Lasinski used a "cost approach" that does not use a royalty base and royalty rate. The cost approach (a well-accepted methodology) is premised on the additional cost that Microsoft would have incurred to avoid infringement—in this case by adding ▮▮▮ of additional servers at great expense. Mr. Lasinski's analysis winnowed the cost savings through multiple levels of apportionment to ensure that the savings attributed to Microsoft's infringement were precisely tailored to the economic footprint of the patent-in-suit.  Mr. Lasinski concluded that those additional servers would have cost Microsoft roughly ▮▮▮ million during the period from August 2011 through December 2019. Importantly, Microsoft's motion does not challenge the propriety of this ▮▮▮ million additional cost.

Mr. Lasinski then reduced the ▮▮▮ million to its value as of the 2009 "hypothetical negotiation" date using a 12 percent "discount rate." Microsoft's motion turns on an infirm premise: that a "discount rate" is a "royalty rate." It is not.  A discount rate to derive present value is a very different concept than a royalty rate. Importantly, the 12 percent "discount rate" was generous to Microsoft and based on data used in the evaluation of capital spending in the software industry. In fact, Microsoft's own damages expert does not challenge that discount rate.

The above-described methodology led Mr. Lasinski to opine that the "baseline lump-sum royalty indicator" under the cost approach was roughly ▮▮▮ million. To determine whether that baseline needed to be adjusted—either up or down—he performed a detailed 13-page analysis of the *Georgia Pacific* factors. Based on voluminous evidence and sound economic reasoning, Mr. Lasinski

LOOKSMART'S RESPONSE AND OPPOSITION TO MOTION          Case No. 17-CV-04709-JST
TO EXCLUDE THE TESTIMONY OF DAMAGES EXPERT

found that factors 6, 9, 10 and 11 supported an upward adjustment from this baseline, while the other factors were neutral.

For example, under *Georgia Pacific* factor 6, Mr. Lasinski detailed his consideration of evidence indicating that Microsoft's ability to deliver relevant answers to news-related queries (facilitated by Microsoft's use of the '530 Patent) ███████████████████████████████████ ██████████████████████. Under *Georgia Pacific* factors 9, 10 and 11, Mr. Lasinski detailed his consideration of evidence indicating that the benefits of the '530 Patent with respect to improved search result relevancy are not fully reflected in his baseline lump sum royalty indicator. As set forth in his report, Mr. Lasinski also explained the bases for his conclusion that other *Georgia Pacific* factors relevant to Looksmart's licensing policies (factor 4), the commercial relationship between the parties (factor 5), and the established profitability of Microsoft's operations related to its use of the '530 patented technology (factor 8) are already reflected in—and therefore do not necessitate an adjustment to—his baseline royalty indicator. As described in his discussion of *Georgia Pacific* factor 15, Mr. Lasinski concluded that, on balance, his baseline indicator did not need to be adjusted.

Far from the "arbitrary" or "rule of thumb" approach that Microsoft accuses Mr. Lasinski of using, his determination of a royalty indicator under the cost approach and reasoned analysis of the *Georgia Pacific* factors is exactly the type of methodology that has been accepted in patent law for many decades. Microsoft is free to cross-examine Mr. Lasinski at trial on the evidence and facts supporting his "real" damages model, but it cannot properly challenge his tried and true methodology under *Daubert*. The motion should be denied.

## II.     THE CONTROLLING LAW CONFIRMS THE SOUNDNESS OF MR. LASINSKI'S METHODOLOGY

In a patent infringement lawsuit, "there may be more than one reliable method for estimating a reasonable royalty." *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1315 (Fed. Cir. 2014). One such method is to "multiply the royalty base, which represents the revenue generated by the infringement,

by the royalty rate, which represents the percentage of revenue owed to the patentee." *Whitserve, LLC v. Computer Packages, Inc.*, 694 F.3d 10, 27 (Fed. Cir. 2012).

An alternative method is the cost approach: "Reliance upon estimated cost savings from use of the infringing product is a well settled method of determining a reasonable royalty." *Powell v. Home Depot U.S.A., Inc.*, 663 F.3d 1221, 1240 (Fed. Cir. 2011) (quoting *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1080–81 (Fed.Cir.1983)); *see also Prism Techs. LLC v. Sprint Spectrum L.P.*, 849 F.3d 1360, 1376 (Fed. Cir. 2017) ("[The] requirement for valuing the patented technology can be met if the patentee adequately shows that the defendant's infringement allowed it to avoid taking a different, more costly course of action. A price for a hypothetical license may appropriately be based on consideration of the 'costs and availability of non-infringing alternatives' and the potential infringer's 'cost savings.'"). This alternative method does not use a base and a rate; instead, the reasonable royalty is the cost savings of using the patented technology as compared with the next best alternative.

The Federal Circuit has not only held that the cost savings method is permissible, it has held that a patentee may recover damages that **exceed** the infringer's cost savings. *See Mars, Inc. v. Coin Acceptors, Inc.*, 527 F.3d 1359, 1373 (Fed. Cir. 2008) ("Coinco is wrong as a matter of law to claim that reasonable royalty damages are capped at the cost of implementing the cheapest available, acceptable, noninfringing alternative. . . . To the contrary, an infringer may be liable for damages, including reasonable royalty damages, that exceed the amount that the infringer could have paid to avoid infringement."); *see also Open Text S.A. v. Box, Inc.*, No. 13-cv-04910-JD, 2015 WL 393858, at *3 (N.D. Cal. Jan. 29, 2015) ("*Mars* stands for the proposition that damages cannot be capped as a matter of law at the cost of implementing the cheapest available non-infringing alternative. . . . basing a reasonable royalty estimate on the cost of implementing non-infringing alternatives is an allowable methodology.").

It is telling that Microsoft has cited no authority for its proposition that Microsoft's cost savings must be split—at all—between Microsoft and Looksmart, and neither Microsoft nor its experts identify or suggest an alternative methodology for making that split.

-3-

III.     **ARGUMENT**

A.     **Microsoft Misstates Mr. Lasinski's Opinion**

The false premise of Microsoft's *Daubert* challenge is set out in the very first paragraph of its brief, where Microsoft says that Mr. Lasinski "applies an arbitrary royalty rate to his derived royalty base." Mot. at 1. Microsoft specifically claims that Mr. Lasinski "multiplies a numerical royalty base by a numerical royalty rate," where (i) the "royalty base" is the "'cost savings' from the alleged use of the invention—which use allegedly allowed Microsoft to deploy fewer servers while achieving equivalent server performance" and (ii) the "royalty rate" is "88%" based on an arbitrary "generic, industrywide discount rate—a 12% weighted average cost of equity." *Id.*

This is demonstrably wrong. Mr. Lasinski's damages opinions rest neither on a royalty rate nor a royalty base. *See* Ex. 1 (Lasinski Report). Those concepts apply to an entirely different method of calculating a reasonable royalty, which is the revenue-based approach. Mr. Lasinski's damages opinion instead rests on a cost savings approach. Ex. 1 at 3-9, 14-19, 35. In a cost savings approach, there is no royalty rate or royalty base.

In addition to Microsoft's fundamental misunderstanding of the cost approach that Mr. Lasinski relied on, Microsoft conflates the concept of a "royalty rate" with a "discount rate"—but those are two very different and unrelated concepts. Contrary to Microsoft's argument, there is nothing in Mr. Lasinski's report or analysis that can be equated with an 88% royalty rate (which Microsoft contrives from the arithmetic difference between 100% and a 12% "discount rate"). Instead, Mr. Lasinski appropriately applied a discount rate of 12% in order to discount Microsoft's cost savings from its use of the patented invention to present value as of the date of the hypothetical negotiation in 2009. Ex. 1 at 19 and exh. 1.1.

B.     **Mr. Lasinski's "Real" Opinion: The Cost Approach**

Against this false backdrop painted by Microsoft, it is critical to fully appreciate the real methodology that Mr. Lasinski actually employed and the evidence supporting his opinions. Mr. Lasinski's methodology that relies on the cost approach and his consideration of the *Georgia Pacific* factors is the type of methodology that has been accepted for decades in patent law.

For purposes of explanation, Mr. Lasinski's methodology can be broken into three categories: (1) his "cost approach" analysis from which he concludes that Microsoft would have incurred roughly ███ million in additional server costs if it did not practice Looksmart's patented invention—Microsoft does not challenge this in its motion; (2) his use of a 12% "discount rate" (not a "royalty rate") based on industry evidence to determine the present value of those cost savings in 2009 (the date of the "hypothetical negotiation") of roughly ███ million (*i.e.*, the "baseline lump-sum royalty indicator")—Microsoft's expert did not challenge the 12% discount rate so its motion falsely recasts that discount rate as a "royalty rate"; and (3) his detailed analysis of the *Georgia Pacific* factors to reach the conclusion that the baseline lump-sum royalty indicator does not need to be adjusted—Microsoft's motion wholly ignores this important piece of Mr. Lasinski's analysis. Each category is addressed in turn:

### 1.    Mr. Lasinski's Cost Approach

Mr. Lasinski did not opine that damages in this case should be awarded based on application of a royalty rate—not a 12% royalty rate, and certainly not an 88% royalty rate. Instead, he opined that a reasonable royalty should be based on Microsoft's cost savings. *See generally* Ex. 1 at 3-9, 14-19, 35.

In a revenue based damages approach (which Mr. Lasinski did not use), a reasonable royalty is calculated by first determining the quantum of infringement—this is the royalty base.  The royalty base may be derived, for example, by reference to the revenue generated on the sale of the allegedly infringing products or service. After the royalty base is calculated in the revenue based approach, it is next multiplied by a royalty rate. That mathematical equation (royalty base x royalty rate) yields the reasonable royalty damages figure. In contrast, under a cost savings approach, there is no multiplication of a royalty base by a royalty rate. For this reason, Microsoft's entire *Daubert* challenge misses the mark—it attacks a damages opinion that Mr. Lasinski simply did not offer.

In a cost savings approach, the analysis is properly tailored to the determination of the cost savings (in dollar values) enjoyed by the infringer through its infringement. Here, according to the cost savings analysis that Mr. Lasinski performed (which Microsoft's *Daubert* challenge does not

dispute), absent entering into a license with LookSmart, Microsoft would have been obligated to make significant capital expenditures to avoid infringement. Ex. 1 at 3-6, 15-19 and exh. 1.1. More specifically, Mr. Lasinski's cost savings analysis is based on evidence that Microsoft's infringement allowed it to enjoy significant cost savings because it deployed far fewer servers than it would have had to deploy absent that infringement. *Id.*

Microsoft does not challenge the use of a cost savings methodology to determine a royalty. Nor could it—the Federal Circuit has repeatedly found that a reasonable royalty can be based on the infringer's cost savings:

> Although a patentee "must carefully tie proof of damages to the claimed invention's footprint in the market place," *Uniloc*, 632 F.3d at 1317 (quoting *ResQNet.com*, 594 F.3d at 869), **that requirement for valuing the patented technology can be met if the patentee adequately shows that the defendant's infringement allowed it to avoid taking a different, more costly course of action. A price for a hypothetical license may appropriately be based on consideration of the "costs and availability of non-infringing alternatives" and the potential infringer's "cost savings."** *Aqua Shield*, 774 F.3d at 771–72; see also *Hanson*, 718 F.2d at 1080–81 ("Reliance upon estimated cost savings from use of the infringing product is a well-settled method of determining a reasonable royalty."); *Powell v. Home Depot, U.S.A., Inc.*, 663 F.3d 1221, 1240–41 (Fed. Cir. 2011); *Slimfold Mfg. Co. v. Kinkead Indus., Inc.*, 932 F.2d 1453, 1458–59 (Fed. Cir. 1991).

*Prism Techs. LLC v. Sprint Spectrum L.P.,* 849 F.3d 1360, 1376 (Fed. Cir. 2017) (emphasis added).

Microsoft also does not challenge Mr. Lasinski's apportionment of the cost savings to the '530 patent's footprint. In particular, taking into consideration the advantages and benefits of the '530 patent and relying on LookSmart's technical expert (Dr. Pazzani), Mr. Lasinski concluded that Microsoft's use of the invention allowed it to avoid purchasing and maintaining ███ of additional servers that would have been required absent the infringement. Ex. 1 at exh. 1.1. Mr. Lasinski's cost savings analysis incorporated multiple levels of apportionment to ensure that the cost savings attributed to Microsoft's infringement were precisely tailored to the economic footprint of the patent-in-suit. Ex. 1 at 3-6, 15-19 and exh. 1.1. Mr. Lasinski concluded that those additional servers would have cost Microsoft roughly ███ million during the period from August 2011 through December

-6-

2019. *Id.* at 5, 19, exh. 1.1. Given the level of detail and the accepted methodology used by Mr. Lasinski, Microsoft's motion does not challenge the propriety of this ███ million additional cost.

### 2.      Mr. Lasinski's Application of a "Discount Rate"

After deriving the amount of Microsoft's savings, Mr. Lasinski next assessed the form of license to which Microsoft and LookSmart would have agreed. Ex. 1 at 13-14. Mr. Lasinski opined that the parties would have agreed to a single, one-time lump sum royalty payment. *Id.* Microsoft does not challenge the propriety of a lump sum royalty.

In this type of license, the infringer pays—up front—the entire amount of the license, calculated as a function of the cost savings enjoyed over the entirety of the license period. *Id.* at 13. Because of the "time value" of money, when calculating a lump sum royalty, it is customary and appropriate to "discount" the royalty to a present value. Mr. Lasinski properly performed that discounting to present value, as set forth below. *Id.* at 19 and exh. 1.1. Microsoft does not dispute this one-time lump-sum structure. Nor could it—Microsoft's own expert also opined that the hypothetical license would be structured as a lump-sum payment. Ex. 2 (Irvine Report) at 17. And the Federal Circuit recognizes that reasonable royalties can be so structured and provides guidance about such royalties:

> Parties agreeing to a lump-sum royalty agreement may, during the license negotiation, consider the expected or estimated usage (or, for devices, production) of a given invention, assuming proof is presented to support the expectation, because the more frequently most inventions are used, the more valuable they generally are and therefore the larger the lump-sum payment.

*Lucent Technologies, Inc. v. Gateway, Inc.,* 580 F.3d 1301, 1327 (Fed. Cir. 2009).

Moreover, it could not be clearer that the arithmetic difference between 100% and the 12% "discount rate" that Mr. Lasinski used is not a "royalty rate," as Microsoft claims. Notably, Microsoft's fictional notion of an "88% royalty rate" is unsupported by any affidavit or declaration from its own damages expert (Ms. Irvine), or even by a single quote from or reference to Ms. Irvine's report or deposition testimony. If Microsoft were on solid footing from an economic standpoint with

-7-

respect to its "88% royalty rate" theory, Ms. Irvine certainly would have addressed that point in her rebuttal report.

As detailed in his report, to calculate his "baseline" reasonable royalty indicator as of the date of the hypothetical negotiation in June 2009, Mr. Lasinski discounted Microsoft's "future" cost savings to a "present" value. Ex. 1 at 19 and exh. 1.1. Present value calculations of the type employed by Mr. Lasinski in his expert opinion are among the most fundamental concepts in economic valuation. The American Institute of Certified Public Accountants (AICPA) explains present value discounting as follows:

> Discounting a future income or cash flow stream to present value is a fundamental procedure in asset valuation.  Rational buyers are assumed to be willing to pay no more for the subject asset than the present value of what they expect to receive in the future.

Ex. 3 (*Discount Rates, Risk, and Uncertainty in Economic Damages Calculations,* AICPA Forensic and Valuation Services Section Practice Aid, 2012) at pdf 11. As noted by the AICPA, "[use] of a higher discount rate [reduces] the present value of future amount of money more than a lower discount rate." *Id.* at pdf 10.

The question then becomes what discount rate to apply to the lump sum royalty?  Mr. Lasinski's analysis considered at least three directly applicable data points for assessing an appropriate rate of return on capital expenditures made by Microsoft. Ex. 1 at 19, 35-36. The first two, and the lowest discount rates, originated from Microsoft itself. *Id.* In January 2009, Microsoft calculated the cost of money for new data center expenditures at ███████████████████ conservative 12% discount rate ultimately applied by Mr. Lasinski. *Id.* And as of June 2009, the exact timeframe of the hypothetical negotiation for assessing damages in this case, Microsoft's weighted average cost of capital was ████████████████ 12% discount rate applied by Mr. Lasinski. *Id.*

████████████████████████████████████████████████████, Mr. Lasinski took a third, more conservative route by applying a discount rate derived from the Ibbotson/Morningstar Cost of Capital Yearbook that is specifically applicable to the

industry in which Microsoft operates – SIC 737 "Computer Programming, Data Processing, and Other Computer Services".  As detailed in Mr. Lasinski's Report:

> I applied a 12% discount rate, which is consistent with the median weighted average cost of equity for companies in SIC 737, "Computer Programming, Data Processing, and Other Computer Services," over the period April 1, 2009 to March 31, 2010. This is higher than Microsoft's 9.86% weighted average cost of capital as of June 2009; further, Microsoft's weighted average cost of capital has generally trended downwards from June 2009 to the present. The discount rate I applied is also higher than the 5% cost of money that Microsoft used as an input when estimating data center build-out costs in its January 2009 journal article titled "The Cost of a Cloud."

Ex. 1 at 35-36; *see also id.* at 5, 19.

The Ibbotson/Morningstar Cost of Capital Yearbook is perhaps the most widely used cost of capital reference guide embraced by valuation experts and appraisers. In fact, the AICPA Forensic and Valuation Services Section Practice Aid expressly directs practitioners to Morningstar/Ibbotson as a reference tool for cost of equity capital measures such as those used by Mr. Lasinski (Ex. 3 at pdf 22), and the Morningstar/Ibbotson guide itself notes its widespread acceptance by Mr. Lasinski's peer valuation professionals (Ex. 4--Ibbotson/Morningstar Cost of Capital Yearbook, 2010, at pdf 3).

Using this widely-accepted resource, Mr. Lasinski opined that a 12% discount rate was appropriate, directly in line with the applicable industry cost of equity capital measure from SIC 737 "Computer Programming, Data Processing, and Other Computer Services" (in which Microsoft operates) at the time of the hypothetical negotiation. Ex. 1 at 19, 35-36. Not only is the 12% discount rate utilized by Mr. Lasinski ███████████████████████████████████████ ████████████████████████████████████████████████████████ ██████ at the time of the 2009 hypothetical negotiation (Ex. 1 at 19, 35-36), it is also higher than the 10.95% median cost of equity for companies in SIC 737 during the immediately prior annual period (ending March 2009). Cost of Capital 2009 Yearbook (Ex. 6 at pdf 4). By using a higher discount rate than any of those other very suitable data points, Mr. Lasinski reduced the amount of Microsoft's royalty.

The above-described methodology led Mr. Lasinski to opine that the "baseline lump-sum royalty indicator" under the cost approach was roughly ██████ million as of 2009 (using the 12 percent

1   discount rate). Ex. 1 at 5, 19, 35. Of significance, Microsoft's own expert applied a 12% discount rate

2   in converting Microsoft's cost savings over the damages period to a lump sum reasonable royalty as

3   of the date of the hypothetical negotiation. *See* Ex. 5 (Irvine Deposition) at 81:25-83:3; Ex. 2 (Irvine

4   Report) at Schedule 1 (labeled as "Discount Factor/Sharing Percentage).

5          Putting this into context, the conservative 12% discount rate that Mr. Lasinski used allows

6   Microsoft to retain a financial return of approximately ███ million over the life of the license. The

7   end result of the discount factor utilized by Mr. Lasinski is that more than ███ of the ███ million in

8   total cost savings inured to Microsoft's benefit. This is a far cry from Microsoft's inaccurate

9   protestation that it would receive only 12% of the cost savings, with a supposed 88% royalty rate. In

10  any event, not even Microsoft's own expert challenged the propriety of the 12% discount rate—she

11  used the same discount rate in her analysis.

### 3.  Mr. Lasinski's Analysis of the *Georgia Pacific* Factors

13         The final question is whether Mr. Lasinski's "baseline lump-sum royalty indicator" of ███

14  under the cost approach needed to be adjusted—either upwards or downwards. Microsoft argues that

15  it should have been "split up" but the evidence supports that the baseline amount is the appropriate

16  royalty to which Microsoft and LookSmart would have agreed.

17         To address that question, Mr. Lasinski went through a 13 page detailed analysis of the

18  *Georgia Pacific* factors. Ex. 1 at 23-36. He determined that factors 6, 9, 10 and 11 support an upward

19  adjustment from the baseline of ███ million, while the other factors are neutral. Notably,

20  Microsoft's motion does not even address—much less challenge—Mr. Lasinski's *Georgia Pacific*

21  analysis. This is fatal to its motion. As described in his discussion of *Georgia Pacific* factor 15, Mr.

22  Lasinski concluded that, on balance, his baseline indicator did not need to be adjusted.

23         Far from the "arbitrary" or "rule of thumb" approach that Microsoft accuses Mr. Lasinski of

24  using, his reasoned analysis of the *Georgia Pacific* factors is exactly the type of methodology that has

25  been accepted in patent law for many decades. The following summary of Mr. Lasinski's *Georgia*

26  *Pacific* analysis—in the order of the factors—confirms that his methodology and conclusions are

27  sound and well-grounded in economics.

-10-

*Factor 1 regarding licensing royalties received by the patentee (Neutral)*: Mr. Lasinski noted that this factor "has a neutral impact on the quantitative baseline lump-sum royalty indicator" because there are no existing licenses under the '530 patent. Ex. 1 at 23;

*Factor 2 regarding licensing rates paid by the licensee (Neutral)*: Mr. Lasinski addressed the licenses/settlements produced by Microsoft, which were fully paid up lump sum licenses. He found this factor neutral and noted that it had already been taken into account in the baseline royalty indicator calculated as a lump sum. *Id.* 23-24;

*Factor 3 regarding nature of license (Neutral)*: Mr. Lasinski found this factor neutral because the negotiated license would be non-exclusive (as opposed to exclusive). *Id.* at 24;

*Factors 4 and 5 regarding licensor's licensing policies and the commercial relationship between the parties (Neutral)*: After noting that LookSmart would have been motivated to enter into a license and the relationship would have been "akin to an inventor and promoter," Mr. Lasinski concluded that "[b]ecause my quantitative baseline lump-sum royalty indicator is derived by reference to the Cost Approach, th[ese] factor[s] would have had a neutral impact." *Id.*;

*Factor 6 regarding the effect of the patented technology on other aspects of the licensee's business/convoyed sales (Upward Adjustment)*: Mr. Lasinski spends four pages (Ex. 1 at 24-27) detailing his consideration of evidence indicating that Microsoft's ability to deliver relevant answers to news-related queries (facilitated by Microsoft's use of the '530 Patent) ██████████████████████████████████████████████████████. Mr. Lasinski cites some of the supporting evidence as follows:

-11-

1

2

3

4 *Id.* at 24-25. Mr. Lasinski also noted that "Microsoft produced many documents in this matter

5 indicating that the features and benefits associated with the '530 Patented technology ██████████

6 ████████████████████████████████████████████████████." *Id.* at

7 25. Given the strength of this evidence, Mr. Lasinski found that this factor supports an upward

8 adjustment of the royalty baseline under the cost approach because "the benefits of the '530 Patent

9 ████████████████████████████████████████████████████████

10 ████████████████████████████████████████████████████████

11 ██████████████████████." *Id.* at 27;

12      **_Factor 7 regarding the duration of the patent (Neutral)_**: Mr. Lasinski concluded that

13 because the cost approach analysis already considered the life of the patent via a lump sum payment,

14 this factor was neutral on the quantitative baseline. *Id.* at 27;

15      **_Factor 8 regarding the revenues and profits from Microsoft's use of the invention_**

16 **_(Neutral)_**: On pages 27-32 of his report, Mr. Lasinski cites voluminous evidence and includes

17 detailed analyses concerning the revenues and profits related to Microsoft's use of the patented

18 invention. Importantly, he apportioned those revenues and profits to the footprint of the '530 patent.

19 The bottom line illustrates the importance of the '530 invention to Microsoft's business: ████████

20 ████████████████████████████████████████████████████████

21 "during the pre-trial period." He concluded: "This analysis demonstrates that there would have been

22 sufficient revenues and profits related to Microsoft's alleged use of the '530 Patented technology to

23 allow Microsoft to pay a royalty consistent with the Cost Approach royalty indicator [of ████

24 million] and still generate a financial return. Accordingly, this factor has a neutral impact on the

25 quantitative baseline lump-sum royalty indicator." *Id.* at 32;

26      As a side note, it bears noting that the above apportioned revenues and profits put into context

27 why Microsoft would have been very willing to accept the baseline royalty of ████ million. That

1  number is ███████████████████████████████████████████. In
2  other words, by paying ███ million for a license, Microsoft keeps the vast majority of these profits
3  and also enjoys all of the added benefits to other aspects of its business as set forth under factor 6
4  above.

5      ***Factors 9 and 10 regarding the advantages and benefits of the patented invention (Upward***
6  ***Adjustment)***: On pages 32-34 of his report, Mr. Lasinski cites voluminous evidence and includes
7  detailed analyses concerning the advantages of the patented technology and its impact on Microsoft's
8  Bing business. For example, Mr. Lasinski concluded that the "evidence indicates that improved
9  search relevancy [facilitated by the '530 patent] ████████████████████████████████." *Id.*
10 at 32. He cites, in part, the following evidence from Microsoft's own documents:

11
12  ████████████████████████████████████████████████████████
13
14                              ██████
15
16  ████████████████████████████████████████████████████████
17

18 *Id.* at 33. Based on this evidence, Mr. Lasinski found that the "████████████████████
19 ██████████████████ would have exerted an upward influence on the quantitative
20 baseline lump-sum royalty indicator at the hypothetical negotiation." *Id.* at 34;

21      ***Factor 11 regarding the extent to which the infringer made use of the invention (Upward***
22 ***Adjustment)***: Mr. Lasinski found that the "extent of Microsoft's alleged use of the '530 Patented
23 [invention] to improve relevancy is not fully reflected in my quantitative baseline royalty indicator."
24 *Id.* at 34. He therefore concluded that this factor "exerted upward influence" on the baseline. *Id.*;

25      ***Factors 12 and 13 regarding the portion of profits relating to the invention or analogous***
26 ***inventions (Neutral)***: Mr. Lasinski did not find any evidence on standard royalties for comparable
27

-13-

technologies and noted some of the above evidence. He concluded that these factors are neutral. *Id.* at 34;

> **Factor 14 regarding the opinion of other experts**: Mr. Lasinski noted that he relied on LookSmart's technical expert, Dr. Pazzani, for various issues, including the benefits of the patented invention to Microsoft. *Id.* at 35;

> **Factor 15 regarding the amount on which a willing licensor and willing licensee would have agreed**: Based on the above evidence, Mr. Lasinski ultimately concluded that the baseline royalty indicator of ███ million did not need to be adjusted (*i.e.*, did not need to be "split up" in Microsoft's parlance):

> > For the reasons discussed above, it is my opinion that the Cost Approach provides a probative quantitative indicator of the reasonable royalty that would have resulted from the hypothetical negotiation in this matter. In general, my assessment of the *Georgia-Pacific* factors indicates an upward impact on the quantitative baseline lump-sum royalty indicator. Specifically, factors #6, #9, #10, and #11 would have exerted an upward influence on the negotiated rate as a result of the importance of improved search relevance to Microsoft's business, which is not fully reflected in the Cost Approach quantitative lump-sum royalty indicator.

> > On balance, and after consideration of all of the factors outlined in this report, I concluded that the approximately ███ million royalty indicator derived via the Cost Approach is a reasonable measure of the reasonable royalty that the parties would have negotiated at the hypothetical negotiation in this matter through trial. Hence, I expect to offer my opinion at trial that, if liability is found against Microsoft, a lump-sum royalty of approximately ███ million would be reasonable for Microsoft's alleged use of the '530 Patent through trial.

*Id.* at 35. He also noted that the ███ million royalty was "conservative" for multiple reasons, including that the evidence supports an upward adjustment under several *Georgia Pacific* factors. *Id.* at 35-36.

Accordingly, Mr. Lasinski exhaustively and comprehensively analyzed the fifteen *Georgia Pacific* factors to confirm his damages opinion, finding most factors neutral and others (factors 6, 9, 10 and 11) exerting upward pressure on the reasonable royalty the parties would have agreed to in the 2009 hypothetical negotiation. Ex. 1 at 23-35. The purpose and effect of this lengthy, detailed, and careful analysis was to determine the reasonableness of the baseline royalty indicator under the cost

approach—testing his opinion against relevant factors. Microsoft concedes that Mr. Lasinski fully and correctly analyzed the *Georgia Pacific* factors—not one line of Microsoft's *Daubert* brief challenges so much as one of his conclusions regarding *Georgia Pacific* factors, let alone the evidence relied upon or the rationale employed to reach those conclusions.

In this light, Microsoft's suggestion that Mr. Lasinski relied on arbitrary numbers like the 50/50 Nash Bargaining Solution or the 25% rule of thumb cannot withstand scrutiny. In the cases cited by Microsoft, the rules of thumb are discredited because they are not tied to specific facts of a given negotiation, the parties or the technology at issue, the time period of the hypothetical negotiation, or anything else that would be case-specific. In contrast, the entirety of Mr. Lasinski's analyses is tied to the facts of this case, and he does not employ any rule of thumb at any point.

It is also noteworthy that despite Microsoft's complaints, when Microsoft's own expert purported to recalculate Mr. Lasinski's royalty opinion "using the correct data," Ms. Irvine made no effort whatsoever to adjust the cost savings any differently than Mr. Lasinski. Indeed, in her deposition testimony, Ms. Irvine confirmed her adoption of Mr. Lasinski's 12% discount rate, the absence of any other alternative discount rate information from Microsoft, and her adoption of Mr. Lasinski's method of determining the quantitative cost savings between licensor and licensee:

> Q.   Okay.  But in any event, at the end of the day, with respect to your Schedule 1 and [Lasinski's] Exhibit 1.1, you each used the same discount factor or sharing percentage, right?
>
> A.   I did not adjust that particular number, correct.
>
> Q.   Okay.  Do you have any basis to propose an alternative discount rate that would be more appropriate to use than the 12 percent discount rate?
>
> A.   I don't have an affirmative opinion on the discount rate, the specific discount rate he should have used, although I think there are things he could have looked into.
>
> Q.   And did you look into those things that you think that he could have looked into?
>
> A.   I did attempt to determine whether Microsoft had a specific rate of return requirement for there being project, for lack of a better term, since it was a new endeavor at the time of the hypothetical negotiation.  I asked through counsel whether there was any -- any documents that might discuss the required or

estimated rate of return specific to -- to Bing or the Bing project and I was not provided anything.

Q.   Okay.   And then on the question of apportioning cost savings between the licensee and the licensor, in your report you do not set out any alternative means of apportioning those cost savings separate and apart from what Mr. Lasinski did, do you?

A.   Not quantitatively, no.

Ex. 5 at 81:25-83:3.

### C.   Microsoft's Claim That Mr. Lasinski Failed to Apportion The Time Value of Money from Rate of Return Is Meritless

In another attempt to confuse, Microsoft complains that Mr. Lasinski did not differentiate between the time value of money and the "royalty rate":

Mr. Lasinski applies a rate split (12% to licensee and 88% to licensor) even less favorable to the licensee and also admits that he made no effort to differentiate the "royalty rate" from the time value of money.

Mot. at 10.

This claim is nonsensical. First, as described above, there is no financial, economic, or evidentiary nexus between Microsoft's artificial 88% royalty rate calculation and a 12% discount rate used in a present value calculation. Second, there is no reason to separate, apportion, or identify the time value of money component from Mr.  Lasinski's discount rate when performing a present value calculation. Again, when Microsoft's own expert Ms. Irvine purported to recalculate Mr. Lasinski's royalty opinion "using the correct data," she made no effort whatsoever to separate, apportion, or identify the time value of money component of the discount rate.

## IV.   CONCLUSION

As shown, Mr. Lasinski carefully analyzed multiple directly applicable data points and employed accepted methodologies. Mr. Lasinski calculated the reasonable royalty as a one time, lump-sum payment calculated as a function of the cost savings Microsoft enjoyed by deploying fewer servers than it would have had to deploy absent its infringement and discounted to a present value

-16-

using a 12% discount rate. Mr. Lasinski also faithfully and carefully evaluated and applied the fifteen *Georgia Pacific* factors.

Because the methodology supporting Mr. Lasinski's opinion is demonstrably sound, what remains is a pure fact question – what royalty would the parties have agreed to?  The jury should be permitted to hear Mr. Lasinski's opinions and determine for themselves what weight the testimony merits in their determination of damages. Questions regarding which facts are most relevant or reliable to calculating a reasonable royalty are "for the jury." *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 856 (Fed. Cir. 2010)("[w]hen the methodology is sound, and the evidence relied upon sufficiently related to the case at hand, disputes about the degree of relevance or accuracy (above this minimum threshold) may go to the testimony's weight, but not its admissibility"); *see also Micro Chemical, Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1392 (Fed. Cir. 2003).  Accordingly, the Motion to Strike should be denied.


Respectfully Submitted,

Dated: June 4, 2019                        By: */s/ Leslie V. Payne*_____
                                                    SPENCER HOSIE (CA Bar No. 101777)
                                                    shosie@hosielaw.com
                                                    DIANE S. RICE (CA Bar No. 118303)
                                                    drice@hosielaw.com
                                                    BRANDON C. MARTIN (CA Bar No. 269624)
                                                    bmartin@hosielaw.com
                                                    **HOSIE RICE LLP**
                                                    600 Montgomery Street, 34th Floor San Francisco, CA 94111
                                                    Telephone: (415) 247-6000
                                                    Facsimile: (415) 247-6001

                                                    Leslie V. Payne
                                                    TX State Bar No. 00784736 (*pro hac vice*)
                                                    lpayne@hpcllp.com
                                                    Eric J. Enger
                                                    TX State Bar No. 24045833 (*pro hac vice*)
                                                    eenger@hpcllp.com
                                                    R. Allan Bullwinkel
                                                    TX State Bar No. 24064327 (*pro hac vice*)
                                                    abullwinkel@hpcllp.com
                                                    Christopher L. Limbacher

TX State Bar No. 24102097 (*pro hac vice*)
climbacher@hpcllp.com
**HEIM, PAYNE & CHORUSH, LLP**
1111 Bagby St. Ste. 2100
Houston, Texas 77002
Telephone: (713) 221-2000
Facsimile: (713) 221-2021

Derek Gilliland
TX State Bar No. 24007239 (*pro hac vice*)
dgilliland@nixlawfirm.com
**NIX PATTERSON & ROACH, L.L.P.**
205 Linda Drive
Daingerfield, TX 75638
Telephone: (903) 645-7333
Facsimile: (903) 645-5389

**ATTORNEYS FOR LOOKSMART GROUP, INC.**

LOOKSMART'S RESPONSE AND OPPOSITION TO MOTION
TO EXCLUDE THE TESTIMONY OF DAMAGES EXPERT

Case No. 17-CV-04709-JST

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 4th day of June, 2019, a true and correct copy of the foregoing **PLAINTIFF LOOKSMART GROUP, INC.'S RESPONSE AND OPPOSITION TO MICROSOFT CORPORATION'S MOTION TO EXCLUDE THE TESTIMONY OF LOOKSMART'S DAMAGES EXPERT, MICHAEL J. LASKINSKI** and accompanying exhibits and declaration was served on all counsel of record via the Court's ECF System.


/s/ *Leslie V. Payne*
Leslie V. Payne

-19-