UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOOKSMART GROUP, INC., <br> Plaintiff, <br> v. <br> MICROSOFT CORPORATION, <br> Defendant. | Case No. 17-cv-04709-JST <br><br> **ORDER GRANTING MOTION TO EXCLUDE EXPERT TESTIMONY** <br><br> **FILED UNDER SEAL** <br><br> Re: ECF No. 118 |

Before the Court is Defendant Microsoft Corp.'s motion to exclude testimony from Plaintiff Looksmart Group, Inc.'s damages expert Michael Lasinski. ECF No. 118. The Court will grant the motion.[1]

## I. BACKGROUND

In this patent dispute, Looksmart claims that Microsoft's Bing search engine and related services infringe Looksmart's patent, U.S. Patent Number 7,356,530 (the "'530 patent"). Complaint ("Compl."), ECF No. 1 ¶ 29.

On March 15, 2019, Looksmart served its expert damages report, authored by Lasinski. ECF No. 137-6. Lasinski calculated damages based on a reasonable royalty that the parties would have agreed to in a hypothetical negotiation on June 3, 2009, the asserted date of first infringement. *Id.* at 6. He concluded that the increased search efficiencies attributable to the '530

---

[1] The Court has filed this order under seal because it contains or refers to material subject to sealing orders. Within seven days of the filing date of this order, the parties shall file a stipulated proposed redacted version of this order, redacting only those portions of the order containing or referring to material for which the Court has granted a motion to seal and which the parties still request be sealed. The parties shall also email a PDF copy of the proposed redacted order, without any ECF headers, to jstpo@cand.uscourts.gov. The Court will review the parties' proposal and issue a redacted version of the order. The parties may also choose to forego redaction altogether.

patent's technology allowed Microsoft to save approximately $▆▆▆ – $▆ over the period from the initial infringement to the expected trial date, and $▆▆▆ from post-trial to the expiration of the patent – by avoiding the costs of "deploying the incremental servers and related hardware" to support a less efficient search engine. *Id.* at 6-8.

Lasinski then "discounted these nominal cost savings during the damages period to the date of the hypothetical negotiation using a 12% discount rate." *Id.* at 8. This rate, Lasinki explained, was "consistent with the median weighted average cost of equity for companies in SIC 737, 'Computer Programming, Data Processing, and Other Computer Services,' over the period April 1, 2009 to March 31, 2010." *Id.* He noted, however, that "[a] discount rate of 12% is higher than – and conservative relative to – Microsoft's 9.86% weighted average cost of capital as of June 2009 and the 5% cost of money that Microsoft used as an input when estimating data center costs in a January 2009 research paper." *Id.* at 8 n.27. Applying this 12 percent discount rate, Lasinski derived "a lump-sum royalty" of approximately $▆▆▆ for the pre-trial period, and an additional $▆▆▆ for the post-trial period. *Id.* at 8 & n.28.

On May 14, 2019, Microsoft filed this motion to exclude Lasinski's testimony. ECF No. 118.[2]

## II. LEGAL STANDARD

### A. Admissibility of Expert Testimony

Federal Rule of Evidence 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and

---

[2] Microsoft also filed a motion to strike Lasinski's expert report for an independent, unrelated reason. ECF No. 108. On June 28, 2019, the Court denied that motion. ECF No. 184.

2

> (d) the expert has reliably applied the principles and methods to the facts of the case.

Trial courts serve a "gatekeeping" role "to ensure the reliability and relevancy of expert testimony." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993)). They should screen "unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014) (citation omitted). The reliability test under Rule 702 and *Daubert* "is not the correctness of the expert's conclusions but the soundness of his methodology." *Id.* (citation omitted). "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010). The proponent of the expert testimony has the burden of proving admissibility. *Lust ex rel. Lust v. Merrell Dow Pharm., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996).

## B. Expert Testimony on Reasonable Royalty

A patentee who proves infringement is entitled to, at minimum, "a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court." 35 U.S.C. § 284. The overarching aim of a reasonable royalty is "to compensate the patentee . . . for its lost opportunity to obtain a reasonable royalty that the infringer would have been willing to pay if it had been barred from infringing." *AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1334 (Fed. Cir. 2015). Stated differently, a "reasonable royalty is the amount that a person, desiring to manufacture [, use, or] sell a patented article, as a business proposition, would be willing to pay as a royalty and yet be able to make[, use, or] sell the patented article, in the market, at a reasonable profit.'" *Aqua Shield v. Inter Pool Cover Team*, 774 F.3d 766, 771-72 (Fed. Cir. 2014) (quoting *Trans-World Mfg. Corp. v. Al Nyman & Sons, Inc.*, 750 F.2d 1552, 1568 (Fed. Cir. 1984) (alterations in original)).

"[T]he classic way to determine the reasonable royalty amount is to multiply the royalty base, which represents the revenue generated by the infringement, by the royalty rate, which represents the percentage of revenue owed to the patentee." *Whitserve, LLC v. Comput. Packages, Inc.*, 694 F.3d 10, 27 (Fed. Cir. 2012). Absent the information necessary to determine an

3

established royalty rate, a reasonable royalty is most "often determined on the basis of a hypothetical negotiation, occurring between the parties at the time that infringement began." *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1312 (Fed. Cir. 2011).

"To be admissible, expert testimony opining on a reasonable royalty rate must 'carefully tie proof of damages to the claimed invention's footprint in the market place.'" *Id.* at 1317 (quoting *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010)). The Federal Circuit has thus deemed such testimony inadmissible where it relies on "a fundamentally flawed tool for determining a baseline royalty rate in a hypothetical negotiation." *Id.* at 1315. For instance, an expert may not start by simply assuming as a baseline that the licensee would "pay a royalty rate equivalent to 25 per cent of its expected profits for the product that incorporates the IP at issue" simply because that figure corresponds to a royalty rate commonly found in the industry or other cases. *Id.* at 1312. Similarly, an expert may not begin "with the assumption that each party would take 50% of the incremental profits" from the hypothetical license. *Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1331 (Fed. Cir. 2014). Even if a mathematical theorem suggests this outcome as a matter of game theory, the expert must first establish that the preconditions for that theorem are present in that specific case. *Id.* Regardless whether the final analysis incorporates other considerations, "[b]eginning from a fundamentally flawed premise [as to the royalty rate] and adjusting it based on legitimate considerations specific to the facts of the case nevertheless results in a fundamentally flawed conclusion" as to the ultimate royalty figure. *Uniloc*, 632 F.3d at 1317. Thus, for example, "a patentee may not balance out an unreasonably high royalty base simply by asserting a low enough royalty rate." *Virnetx*, 767 F.3d at 1333.

C.  **Cost Savings Approach to Reasonable Royalty**

The Federal Circuit has also explained that, "[a]lthough a patentee 'must carefully tie proof of damages to the claimed invention's footprint in the market place,' that requirement for valuing the patented technology can be met if the patentee adequately shows that the defendant's infringement allowed it to avoid taking a different, more costly course of action." *Prism Techs. LLC v. Sprint Spectrum L.P.*, 849 F.3d 1360, 1376 (Fed. Cir. 2017) (quoting *Uniloc*, 632 F.3d at 1317). It is therefore well established that "[a] price for a hypothetical license may appropriately

4

be based on consideration of the 'costs and availability of non-infringing alternatives' and the potential infringer's 'cost savings.'" *Id.* (quoting *Aqua Shield*, 774 F.3d at 771-72); *see also Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1080-81 (Fed. Cir. 1983) ("Reliance upon estimated cost savings from use of the infringing product is a well settled method of determining a reasonable royalty." (collecting cases)).

## III. DISCUSSION

The parties' arguments have evolved over the course of briefing on this motion. Microsoft initially contended that Lasinski's methodology must be excluded as unreliable because his 12 percent discount rate was based on an industry-wide assumption rather than tethered to the specific facts of this case. ECF No. 119-4 at 14-16. In response, Looksmart disputed whether the 12 percent discount rate constituted a "reasonable royalty rate." ECF No. 137-4 at 7. According to Looksmart, Lasinski applied that rate "in order to discount Microsoft's cost savings from its use of the patented invention to present value as of the date of the hypothetical negotiation in 2009." ECF No. 137-4 at 7.

Accepting that premise, Microsoft's reply offers a different critique. Microsoft notes that the roughly $39 million figure purportedly represents the value of the avoided cost at the time of the 2009 hypothetical negotiation (minus "the time value of money and the standard risk involved in an equity investment" baked into the weighted average cost of capital calculation). ECF No. 149 at 3. Viewed in this light, Microsoft contends, Lasinski's report arbitrarily allocates the entire value of the cost savings to Looksmart. ECF No. 149 at 5.

As an initial matter, Looksmart is correct that neither the 12 percent discount rate its expert applied, or the 88 percent of avoided costs allocated to Looksmart, is a royalty rate. The discount rate accounts only for the time value of money and the standard risk involved in an equity investment. *See Energy Capital Corp. v. United States*, 302 F.3d 1314, 1333 (Fed. Cir. 2002) ("[T]he discount rate performs two functions: (i) it accounts for the time value of money; and (ii) it adjusts the value of the cash flow stream to account for risk."). "The value of an asset is simply the present value of its future cash flows." Robert M. Lawless & Stephen P. Ferris, *Economics and the Rhetoric of Valuation*, 5 J. BANKR. L. & PRAC. 3, 11 (1995). "Discounting is the process

5

by which courts take into account the time value of money to avoid overcompensating the injured party." Christopher P. Bowers, *Courts, Contracts, and the Appropriate Discount Rate: A Quick Fix for the Legal Lottery*, 63 U. CHI. L. REV. 1099, 1099 (1996). Thus, the purpose of applying a discount rate is not to allocate 12 percent of Microsoft's avoided costs to Microsoft, but to make sure that Looksmart's avoided costs figure represents Microsoft's true avoided costs. Therefore, as adjusted, Looksmart allocates all of Microsoft's avoided costs to Looksmart.

That means that the parties' dispute boils down to whether, under the hypothetical negotiation approach, "Microsoft's cost savings must be split – at all – between Microsoft and Looksmart." ECF No. 137-4; *see also* ECF No. 149 at 5-6. Looksmart assumes they would not. As a matter of both rudimentary economics and common sense, the assumption is insupportable. If Microsoft were required to pay a royalty consisting of all its avoided costs in order to use an invention, what would be the point of the invention? Microsoft would gain nothing by its use, so the hypothetical negotiation would never take place. *See, e.g.,* Richard A. Posner, *Utilitarianism, Economics, and Legal Theory*, 8 J. LEGAL STUD. 103, 114 (1979) ("The basic Paretian argument is that a voluntary market transaction . . . *must* make both parties better off, and so increase the level of welfare or happiness in the society, for *if both A and B were not made better off by the transaction at least one of them would refuse to consent to it*." (second emphasis added)); Bennett S. Miller, Note, *No Such Thing As A Free Lunch: Hurricane Katrina and the Davis-Bacon Act*, 16 S. CAL. REV. L. & SOC. JUST. 197, 246 n.365 (2006) ("Contractors are assumed to be rational economic actors, and they therefore will engage in an activity *only if it makes them better off than had they not engaged in the activity*." (emphasis added)). Because Microsoft would be no better off by bargaining away all its avoided costs, 100 percent of those costs cannot possibly be "the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began." *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009).

Nor can Looksmart's assumption that the negotiation would start with all of the avoided costs going to it be squared with *Virnetx*. As noted above, the *Virnetx* court held that an expert cannot simply assume that the parties would split the incremental profits from the license in half.

767 F.3d at 1332-33. The *Virnetx* court explained that admitting that testimony was error because "the suggestion that those profits be split on a 50/50 basis – even when adjusted to account for certain individual circumstances – is insufficiently tied to the facts of the case, and cannot be supported." *Id.* at 1334. If Lasinski applied his approach to incremental profits, it would flunk the *Virnetx* test.

The only question, then, is whether avoided costs should be treated differently than incremental profits, such that an expert may simply assume that the patentee would recoup the entire value of the avoided costs as a royalty – in effect, a per se rule. Looksmart's arguments on this score are not persuasive.

Authority holding that "[a] price for a hypothetical license may appropriately be *based on consideration* of the 'costs and availability of non-infringing alternatives' and the potential infringer's 'cost savings,'" *Prism Techs.*, 849 F.3d at 1376 (emphasis added) (quoting *Aqua Shield*, 774 F.3d at 771-72), does not establish that the license price must *equal* the cost savings, or even that the parties' negotiation would start there. Rather, the cases of which the Court is aware have divided avoided costs between the parties. *See Hanson*, 718 F.2d at 1077 (affirming award consisting solely of one-third of avoided costs where magistrate found that "[e]xpert testimony on this record indicates that one-third of the cost savings would be deemed acceptable to both parties in an arm's length license negotiation"); *TC Tech. LLC v. Sprint Corp.*, No. 16-CV-153-RGA, 2019 WL 2515779, at *2 (D. Del. June 18, 2019) (denying motion to exclude testimony in which expert apportioned cost savings and "allocate[d] 64% to 74% of what remains to [the infringer], based on how the parties to the hypothetical negotiation would have split the cost savings").[3]

Looksmart's reliance on *Mars, Inc. v. Coin Acceptors, Inc.*, is misplaced. 527 F.3d 1359 (Fed. Cir. 2008), *mandate recalled and modified on other grounds by* 557 F.3d 1377 (Fed. Cir.

---

[3] *But see Slimfold Mfg. Co. v. Kinkead Indus., Inc.*, 932 F.2d 1453, 1458 (Fed. Cir. 1991). The district court in *Slimfold* included "all profits that [the infringer] realized in the form of manufacturing cost savings" as a component of its damages award. *Id.* That ruling was not contested on appeal and Federal Circuit expressed no views on it.

2009). In *Mars*, the patentee sought a reasonable royalty based on a percentage of infringing sales. 527 F.3d at 1363-64. The Federal Circuit rejected the infringer's argument that "reasonable royalty damages are capped at the cost of implementing the cheapest available, acceptable, noninfringing alternative." *Id.* at 1373. The *Mars* court considered whether the costs of avoiding infringement operated as an independent cap on a royalty theory based on sales revenue. It does not necessarily follow that a patentee is per se entitled to 100 percent of avoided costs when that is the only damages theory asserted.

Looksmart's attempts to locate a case-specific justification in Lasinski's expert report also fail. Citing Lasinski's $█ damages estimate, Looksmart contends that "more than 52% of the $█ in total costs savings inured to Microsoft's benefit." ECF No. 137-4 at 13. But Looksmart elsewhere concedes that $█ represents the "present value as of the date of the hypothetical negotiation in 2009" for the entire $█ *Id.* at 7; *see also id.* at 4 ("Mr. Lasinski then reduced the $█ to its value as of the 2009 'hypothetical negotiation' date using a 12 percent 'discount rate.'"); *id.* at 10 ("Because of the 'time value' of money, when calculating a lump sum royalty, it is customary and appropriate to 'discount' the royalty to a present value. Mr. Lasinski properly performed that discounting to present value, as set forth below."). Again, Looksmart provides no reason that, during a 2009 negotiation, the parties would have contemplated allocating all of the then-present value of the license to Looksmart.

Finally, it is no answer that some of Lasinski's other intermediate assumptions, such as the discount rate itself, were "conservative" in Microsoft's favor. The Federal Circuit has rejected this method of compensating for a flawed premise. *See Virnetx*, 767 F.3d at 1333 ("[A] patentee may not balance out an unreasonably high royalty base simply by asserting a low enough royalty rate."). Relatedly, Lasinski's analysis of the *Georgia-Pacific* factors does not salvage the unreasonableness of his starting point. *See Uniloc*, 632 F.3d at 1317 ("It is of no moment that the 25 percent rule of thumb is offered merely as a starting point to which the *Georgia–Pacific* factors are then applied to bring the rate up or down.").

Accordingly, the Court concludes that Lasinski's testimony is inadmissible.

/ / /

8

## CONCLUSION

For the foregoing reasons, the Court grants the motion to exclude Lasinski's testimony pursuant to Federal Rule of Evidence 702 and *Daubert*.

**IT IS SO ORDERED.**

Dated: July 12, 2019

JON S. TIGAR
United States District Judge