*CERTIFIED COPY*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable JON S. TIGAR, Judge

| | | |
|---|---|---|
| LOOKSMART GROUP, INC., | ) | **Motion to Strike** |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | NO. C 17-04709 JST |
| | ) | |
| MICROSOFT CORPORATION, | ) | Pages 1 - 38 |
| | ) | |
| Defendant. | ) | Oakland, California |
| _____ | ) | Wednesday, October 2, 2019 |

<u>**REPORTER'S TRANSCRIPT OF PROCEEDINGS**</u>

APPEARANCES:

For Plaintiff:            Hosie Rice LLP
                         Transamerica Pyramid, 34th Floor
                         600 Montgomery Street
                         San Francisco, California  94111
                    BY:  BRANDON C. MARTIN, ATTORNEY AT LAW

                         Heim, Payne & Chorush, LLP
                         1111 Bagby, Suite 2100
                         Houston, Texas  77002
                    BY:  ERIC J. ENGER, ATTORNEY AT LAW


For Defendant:            Fish & Richardson, P.C.
                         12390 El Camino Real
                         San Diego, California  92130
                    BY:  JUANITA R. BROOKS,
                         JASON W. WOLFF, Attorneys at Law

            (Appearances continued next page)

Reported By:        Raynee H. Mercado, CSR No. 8258


    Proceedings reported by electronic/mechanical stenography;
transcript produced by computer-aided transcription.

## A P P E A R A N C E S (CONT'D.)


For DEFENDANT:              Fish & Richardson P.C.
                           500 Arguello Street, Suite 500
                           Redwood City, California  94063
                      BY:  BETTY H. CHEN, ATTORNEY AT LAW




                           --o0o--

```
1   Wednesday, October 2, 2019                        2:12 p.m.

2                    P R O C E E D I N G S

3        THE CLERK:  Your Honor, now calling civil matter

4   17-4709, Looksmart Group v. Microsoft Corporation.

5      If counsel could please come forward and state their

6   appearances for the record.

7                    (Off-the-record discussion.)

8        MR. MARTIN:  This is Brandon Martin for plaintiff

9   Looksmart.  Eric Enger, also for plaintiff Looksmart, will be

10  presenting today.

11       MR. WOLFF:  Jason Wolff for Microsoft.  With me today

12  is Juanita Brooks.

13       THE COURT:  Great.  Is Betty Chen here?  She's on our

14  appearance sheet here.

15     The record will reflect that Ms. Chen also is present.

16     All right.  The case is on calendar for Microsoft's motion

17  to strike Michael Pazzani's expert report.

18     Mr. Wolff, you can go first.

19                    (Pause in the proceedings.)

20       MR. WOLFF:  Apologize for that short delay.

21       THE COURT:  That's all right.  The transcript -- the

22  comment I'm about to make is not going to make sense in

23  isolation, but the parties observed a prior hearing in which

24  the court expressed its annoyance with some things that some

25  other people did in a totally unrelated case -- some totally
```

1     unrelated people did in a totally unrelated case, and I don't

2     want that to let anybody get off their game.

3          **MR. WOLFF:**  So I'll be pretty brief with my remarks.

4     This court has patent rules, and it has patent rules for a

5     reason.  Your Honor has opinions on those, a very analogous

6     case is cited in our briefs.  And those rules are there to put

7     the burden on the parties to crystallize their theories early

8     in the case.

9          The burden is on the party with that contention to put

10    that in front of the court, and the rules are very specific.

11    They are knit-picky I think is the term some of the cases use.

12         We're here because Looksmart violated those rules.  And

13    Dr. Pazzani's report extends beyond the theories disclosed in

14    Looksmart's patent rule contentions.

15         Specifically, Patent Local Rule 3-1B states that in the

16    infringement contentions, each product accused of infringement

17    shall be specifically identified.  This identification shall

18    be as specific as possible.

19         Looksmart's patent rule contentions -- this is DI159

20    dot -- -8 at 3 -- identifies the product or the thing that is

21    accused of infringement.  This is the Bing search engine.

22                    (Off-the-record discussion.)

23         **THE COURT:**  Bing, B-i-n-g.

24         **MR. WOLFF:**  -- Bing Search Engine.  I'm sorry.

25    This is consistent with its complaint.  If we look at

1  the -- the plaintiff's complaint, it accuses a search engine a

2  web search engine of infringement and specifically identifies

3  the Maguro portion of the search engines, which is the -- part

4  of the Web index for Bing.

5      **THE COURT:**  Madam Reporter, Maguro like a sushi

6  restaurant, M-a-g-u-r-o.

7      **MR. WOLFF:**  Looksmart's patent Rule 3-1c contentions,

8  their claim charts, also are supposed to identify those same

9  instrumentalities.  And they're supposed to map out what that

10  theory is, the theory for infringement so that Microsoft has a

11  good idea, a good understanding of what that is.

12      They don't have to marshal every piece of evidence or

13  every shred of information.  The expert reports will do that.

14  But it does have to clearly articulate consistent the 3-1B

15  disclosure what it was that was accused of infringement.

16      And, again, this chart needs to be as specific as

17  possible, identifying for each limitation of every claim

18  against each accused product how it is that product satisfied

19  the claim, what exactly that theory is.

20      Now, Looksmart admits at page 4 of its reply brief, the

21  bottom portion of that -- of that page, that it had an

22  epiphany in August 2018, that it suddenly realized it needed

23  to focus its efforts on the Bing News index.

24      And when Microsoft heard this, it asked for a chart.  It

25  asked for plaintiff to amend its contentions and identify

1   exactly what it was that was accused of infringement and how

2   it was that it satisfied the claims.

3       Looksmart didn't do that.  It stuck with its May 2018

4   patent rule contentions.  There are 71 pages of charts in

5   there.

6       And if we search through -- trawl through the records,

7   trawl through the charts to see what it is they say about

8   "News," this is what you'll find.

9                   (Demonstrative published.)

10          MR. WOLFF:  There's nothing.  There's nothing in the

11   charts about the News index.  All the charts talk about as --

12   is Bing at a very high level or specifically their identifying

13   features that are characteristics of the Web index, which

14   is -- Maguro is one of those -- as to how that might satisfy

15   the claims.

16       The theory is not crystallized.  The theory is not clear.

17   There's no separate charts.  There's not even an allegation in

18   the charts that all indexes for Bing work the same way.  What

19   they are is Bing generally, and specifically they identify the

20   Maguro index.

21       If we looked at Dr. Pazzani's report on News in the 140

22   pages of the document that's been put in front of Your Honor,

23   it's 113 times he mentions News.  And Looksmart will get up

24   here, I'm sure, and tell you that, you know, if you go through

25   the record and pull up all these other documents, somewhere in

1   a document that wasn't cited in the contentions or somewhere

2   in a document that was, that document talks about News, and

3   Bing -- Microsoft should have to read the tea leaves to figure

4   out how exactly the plaintiff was applying that theory to the

5   accused instrumentality.

6          And we suggest, Your Honor, that that's simply not -- not

7   the standard.  That's not what's required by us.  It should

8   not be required by the court to have to sift through the

9   record to figure out what -- where exactly this theory was

10  disclosed.  It should be right there in the contentions.  That

11  seems to be the point of the Patent Local Rules.

12         The remedy here we think is straightforward.  The remedy

13  is to strike the infringement theory.  We cited cases in the

14  briefs.  I'm not going to rehash those cases.

15         The *Adobe Wowza* case is probably the -- the most on-point

16  case that this court could follow and come up with the same --

17  same result.  Something that -- that's happened that's changed

18  the character of this case here that -- that warrants

19  mentioning again is that with the infringement contentions

20  that were served, what was in play was an ███

21  ████████████████ index for the Bing Web index.

22         With the modified theory for Bing News, what's at play is

23  an index for claims one and six that's █████████████████

24  pages, so ██ percent of the universe of things that were

25  supposedly at play initially are in play now.

1   It's not just a matter of narrowing the case.  It's a

2   matter of changing the theories, which for reasons I can --

3   happy to go in -- happy to go into, but I don't think it's

4   necessary here.

5        For claim 12, the theory went from █████████████████

6   pages in the index to ██████ pages.  That's ███████████████

7   ██████████ is what's at issue for claim 12.  And yet if you look

8   through the infringement contentions, what you'll see is the

9   theory is the same for every single independent claim that's

10  accused.

11       Why did the theory change between claim 12 and claims one

12  and ten?  There's no explanation.  No effort to explain that

13  in Looksmart's opposition.

14       I did want to identify to the court one recent case that

15  was decided by the Federal Circuit.  It is a nonprecedential

16  case.  We identified it to plaintiff's counsel last week when

17  we learned of it.  It's *Phigenix vs. Genentech*.  It was an

18  appeal from Judge Freeman in this court.  It's a slip opinion

19  that's at the Federal Circuit website right now.  The case

20  there is 2017-2617 and 2018-1042.  It was published September

21  5th.

22       In that case, Judge Freeman was presented with a very

23  similar situation which is illustrative to what we see here.

24  And in that case, plaintiff modified its infringement theory

25  to shrink down the universe of accused products from basically

1    a hundred percent of the -- the sample group to 4 percent of

2    the sample group.

3        And as with that case, this case is similar.  We have an

4    even greater reduction in the change in the scope of the case

5    which fundamentally changes questions about invalidity, about

6    non-infringement, of which Your Honor's aware because of the

7    pending summary judgment motion, where what Microsoft is doing

8    there is pointing to these very differences that are not

9    identified in the patent rule contentions.

10       So unless Your Honor has questions, I'll sit down.

11           **THE COURT:**  I don't.  Thanks.

12       Mr. Martin.  Oh, no.  Mr. Enger.

13           **MR. ENGER:**  Good afternoon, Your Honor.  Eric Enger

14   for the plaintiff Looksmart.  Microsoft's motion fails on the

15   law, fails on the facts, and fails as a matter of common

16   sense.  Let me tell you why, and I'll be brief.

17       With respect to the law, it's settled that the

18   infringement contentions need to crystallize the parties'

19   theories of infringement early in the case.  But the

20   infringement contentions don't to have list every piece of

21   evidence that you might use to support that theory.  There's a

22   difference between the evidence and the theory.  The theory

23   can be somewhat broad.  The evidence supporting it is much

24   narrower.  The evidence has developed during discovery and

25   then it finds its way into the expert reports at the end.

1    The law is clear that the scope of the infringement

2    contentions and the expert reports do not need to be

3    coextensive.  They're very different.

4        Microsoft confuses the infringement contentions with the

5    expert reports, which is a legally untenable position.

6                    (Demonstrative published.)

7        **MR. ENGER:**  On to the facts.  This is as timeline of

8    relevant events that have occurred in this case.  It starts

9    backs in August of 2017 when Looksmart filed its initial

10   complaint.  Your Honor, that complaint was very clear that

11   Bing was the accused product.  And it included a web address

12   as a part of the accused product, www.bing.com.

13       There was nothing about News, nothing about images.  Bing,

14   the entirety sort of the search engine, was the accused

15   product.

16       Six months later, the infringement contentions comes out

17   in February of 2018.  And, again, consistently, they accuse

18   Bing as the accused instrumentality.  But they specifically

19   mention something called Blue Whale and Superfresh.  Now,

20   those are internal code names at Microsoft for the very

21   technology that supports News.

22       Now, importantly, these infringement contentions had a

23   theory of infringement, and that theory applied broadly to the

24   entirety of bing.com.  There wasn't one theory for News and

25   one theory for Web and another theory for Images.  It was one

1    common theory.  And I'm going to go over that theory with you,

2    Your Honor, in just a second.  But the important thing to

3    understand, it's a unified theory, and there's one of them.

4        Next, after conducting discovery in May of 2018, Looksmart

5    found some things in the documents -- in the discovery

6    produced to date about something called a query cache.  And so

7    that query cache and that theory was not in the infringement

8    contentions so Looksmart did the responsible thing and moved

9    to amend.  It recognizes whenever you add things to the case,

10   you need to amend.

11       So what did we do?  We gave a copy of the infringement

12   contentions, the claim charts, to Microsoft at that time.  And

13   it -- those -- I mean -- those claim charts that we handed

14   over are the exact same ones that are in play today.  And

15   Microsoft looked at them.  And what did they do?

16       Let me tell you what they didn't do.  They didn't complain

17   and say, "The theory isn't here.  We don't understand the

18   theory."  They didn't say, "You know what, you need to have

19   separate charts for News and Web and Images.  Putting them all

20   into one chart.  That's unacceptable."  That was a time when

21   they could have raised those arguments and those points, but

22   they didn't.

23       What they did do is they stipulated that those

24   infringement contentions were A-okay.  And it -- because they

25   are, in fact, Your Honor.

1    The next major milestone in the case happened in August of

2    2018.  And Mr. Wolff referred to this as an epiphany.  And not

3    far from the truth, Your Honor.  This is whenever Microsoft

4    finally produced the Bing ████████████ files that explain

5    how Bing works.  It -- this is evidence and source code

6    that -- that Looksmart had been asking for for eight months,

7    and Microsoft sat on its hands until August of 2018.

8        And what did we realize whenever we started looking at

9    those source code files?  We realized that the theory might

10   actually only apply to a small subset of Bing.  The theory

11   didn't change.  It was always the same theory.  It just didn't

12   work for things other than News.  And that's what happened

13   here.

14       So what did we do after we realized that the theory only

15   really applied to News, the same theory?  We really dug in on

16   our discovery into News.  We served interrogatories about

17   News.  We served documents requests about News.  We took

18   depositions about News.  We even sent them a letter saying,

19   "this is News, and this is what infringes.  This is what we're

20   focused on."

21       This wasn't hide the ball here.  Everybody knew we were

22   talking about News, Your Honor.

23             THE COURT:  Is your discovery exclusively focused on

24   News?  I ask that question because I'm not going to recall the

25   exact numbers from the briefs.  But in making this -- a

1   similar point there that you're making here, you cited a

2   couple of interrogatories, but they were something like

3   numbers 27 and 29, which beg the question for me, what do the

4   other 26 at least -- 27 interrogatories say.

5           **MR. ENGER:**  There were a number of interrogatories

6   that were served prior to that point.  My understanding, and I

7   can go back and look at the record if you really want to know

8   the answer, I believe that the vast majority of them after

9   August of 2018 were focused on News.

10          **THE COURT:**  Right, it doesn't -- I'm not asking

11  actually about prior interrogatories at a different point in

12  time.  I'm just trying to determine whether your point is that

13  you were focusing your discovery exclusively on News or

14  whether it was included as a topic of discovery.

15          **MR. ENGER:**  And, again, we -- the exhibits were cited

16  in -- in the brief, and I have them here, and we can go

17  through them in just a second if this matters.

18      But what I -- what I understand happened was it was

19  predominantly on News.  There might have been one or two

20  interrogatories on something else, but almost everything was

21  focused on News.

22      That is what I recall.

23          **THE COURT:**  All right.

24          **MR. ENGER:**  So, again, we sent them this letter

25  that -- telling them News, is what infringes.  What did

1   Microsoft do in response?  This is very telling.

2       In October of 2018, they have an interrogatory response

3   where they acknowledge that Looksmart has now narrowed its

4   case to News.

5       What else happened?  This is probably the -- the most

6   interesting fact, Your Honor.  In February of 2019, they

7   entered into a stipulation where they said, Bing News and only

8   Bing News was the, quote, accused product functionality.

9   That's a direct quote.

10      For them to say that they didn't understand that News was

11  an accused product is -- is -- rings hollow.

12      So, Your Honor, Microsoft can't reasonably claim surprise

13  when in March of 2019, they received Dr. Pazzani's

14  infringement report that focused on News.

15          **THE COURT:**  Can you just tell me where in the brief

16  is mention of the October 2018 and February 2019 events so I

17  can put a paper clip on that?

18                  (Pause in the proceedings.)

19          **THE COURT:**  If you don't have it at your --

20                  (Simultaneous colloquy.)

21          **THE COURT:**  -- find it later.

22          **MR. ENGER:**  Right here.  Page 7 of the brief is where

23  we talk about the stipulation.  And the -- page 6 is where

24  we -- Micro- -- talk about Microsoft's interrogatory response

25  where it says it understands that the -- Looksmart has

1    narrowed its case.

2         So, Your Honor, again, the -- the infringement report

3    comes out in -- in March of 2019.  The next important date is

4    in April of 2019.  This is whenever Microsoft moved to strike

5    the damages expert report for exceeding the contentions.

6    Again, the -- the damages expert report was served on the same

7    day as the infringement expert report and timely Microsoft

8    moved to strike it.

9         What didn't they do?  Move to strike Dr. Pazzani's report.

10   And the reason is 'cause they knew there was nothing wrong

11   with Dr. Pazzani's report.  It did not exceed the

12   extensions -- contentions, only, so they say, did the damages

13   expert's report.

14        Fast-forward two more months.

15             THE COURT:  Hmm.

16             MR. ENGER:  Now we're in June of 2019.  Looksmart

17   moves to strike Microsoft's non-infringement defenses.  Those

18   were disclosed after the close of discovery.  Everybody agrees

19   to that.  And what happens two days later?  Microsoft did move

20   to strike Dr. Pazzani's report, and they waited three months

21   to move to strike Dr. Pazzani's report, and they did it just

22   two days after we filed our motion.

23        Your Honor, I'd like to now just go back to the complaint

24   and -- and point out something that I think is very important.

25   Again, I told you that the complaint accused Microsoft Bing,

1    and it specifically -- this is a quote.

2           THE COURT:  Let me ask you a question about this

3    chain of events and that legal significance of it.  Let's say

4    that the court concludes that -- let's say the court limits

5    its review to the contentions themselves in the expert report

6    and it concludes that the contentions cannot fairly be read to

7    encompass the expert report.

8        I hear you making an argument, at least implicitly, that

9    there is a -- I don't know if "waiver" is the right word --

10   but essentially that if the accused infringer knows what the

11   focus of the litigation is, that ought to be enough.  Right?

12       Otherwise -- I mean, otherwise, what would be the

13   relevance of these other events, which are neither their

14   expert report nor their contentions.  So my question for you

15   is, am I right that that's the argument?  And if I am -- if

16   I'm not right, then that's the end of that.  And if I am

17   right, what's your best case.

18           MR. ENGER:  I don't -- I'm not contending that

19   there's some sort of a waiver.  I've -- at least I've seen no

20   cases to support that --

21                (Simultaneous colloquy.)

22           THE COURT:  You're not --

23           MR. ENGER:  It makes sense as a matter of --

24           THE COURT:  Waiver --

25                (Simultaneous colloquy.)

```
 1          MR. ENGER:  -- I've not seen that.

 2          THE COURT:  Waiver is the wrong formulation.  It's

 3   just that, you know, they know.  In other words, that these

 4   other materials should be read by the court to act as a

 5   substitute for amended infringement contentions, either as a

 6   matter of legal principle or equity.

 7       Is that the argument?

 8          MR. ENGER:  That is not the argument we're making,

 9   Your Honor.

10          THE COURT:  Then I'll stop interrupting you.

11          MR. ENGER:  Thank you.

12       The accused product from the complaint was Bing and we had

13   provided a web address, www.bing.com.  And let me show you the

14   significance of that.

15                  (Demonstrative published.)

16          MR. ENGER:  This is a screen shot taken just a few

17   days ago of www.bing.com.  Now, what don't you see here?  You

18   don't see a News subset.  You don't see a Web subset.  You

19   don't see a Images subset.  There's just a -- one unified

20   product called "Bing," and it has one-search-engine tool bar.

21          THE COURT:  Is it true that if I were to enter

22   something into the Bing search engine, for example, the word

23   "Trump," as you've indicated in your demonstrative, that in

24   the search results, there would be a tab called "News"?

25          MR. ENGER:  No.  Let me show you what there is.  This
```

1   is what you get (indicating).

2                    (Demonstrative published.)

3        **MR. ENGER:**  And you see that the very first entry is

4   "News about Trump."

5     It's one unified search results page, and it has News.

6        **THE COURT:**  But isn't the answer to my question

7   "yes"?  At the top, you've underlined the word "All," and next

8   to it, there's a tab that you could underline that says

9   "News."

10       **MR. ENGER:**  I didn't underline "all."  This is part

11  of the screen shot.

12       **THE COURT:**  Right.  I'm not saying that you did or

13  didn't do anything.  I'm just saying that the results are

14  segmented on this results page so that you could include

15  results from all of the subparts of Bing.  But this page

16  itself demonstrates that there's a subpart called "News."  I

17  don't know how important that is.

18     I'm just saying -- I'm just reflecting on your

19  characterization of the search page in which you said, it's

20  not segmented.  And now I'm looking at the results, and it

21  appears to me that they are segmented into "All," "News,"

22  "Images," "Videos," "Maps," "Shopping" --

23       **MR. ENGER:**  I do --

24       **THE COURT:**  -- a symbol that I don't know what it's

25  doing there, and the word "My Saves."

1    **MR. ENGER:**  Your Honor is absolutely correct that the

2    results can be segmented.  But the default is to show them

3    all.  And what we accused of infringement was bing.com, and

4    there's no "News" -- way to segment on "News" -- way to

5    segment by "News" on the search results.  What you get here --

6        **THE COURT:**  Could you proceed with an infringement

7    theory against "images" without doing anything in the case?

8    Because we've decided that it's just the infringement

9    contentions and the Pazzani report.  If Pazzani said, "Okay.

10   Here's where the action is.  The action is in 'images,'" could

11   you go down that path just because bing.com in toto has been

12   accused?

13       **MR. ENGER:**  Yes, Your Honor, we could.  And let me

14   tell you why.  Because bing.com was accused, and the theory

15   that we put forth in our infringement contentions is broad

16   enough to encompass "Images" and "Web" and "News" and all of

17   them.  The theory is what is broad, and the specific evidence

18   of that is what you -- start to get into the details.

19       **THE COURT:**  Okay.

20       **MR. ENGER:**  Let me explain a little bit about the way

21   Bing works.  This was Exhibit A from our brief.

22       **MR. MARTIN:**  Pardon me, Eric.

23       **THE COURT:**  Counsel, could I ask you to come to the

24   microphone.  Just I have been on the bench since 8:30 in the

25   trial, so has Ms. Mercado been helping me.

1      **MR. MARTIN:**  Pardon me.

2      Before we get into this, can we ask the court to clear the

3   courtroom of non-court personnel?

4      **THE COURT:**  No such persons are here.

5      **MR. MARTIN:**  Okay.  Thank you very much.

6      **MR. ENGER:**  This is Exhibit A to our opposition.  And

7   this is a Microsoft internal document.

8      You can see that there are three tiers to Bing.  The first

9   tier is the one that we're focused on with Dr. Pazzani's

10  report.  It's called the "Fresh" tier, and you see that the

11  target scenario -- the very first one, the primary scenario

12  for first tier is "News."  And it uses the Taza technology.

13     There's also to other tiers, a "Precision" tier that does

14  main line.  And it uses the "Tiger" technologically, no -- no

15  pun intended.  And the "Comprehensive" tier, which uses the

16  best content or the largest content, and it's uses the

17  "Maguro."

18     Microsoft basically says our case is limited to that third

19  tier, "Comprehensive," whenever I'm going to show you in just

20  a minute, we've clearly cited the "Fresh," the "Taza," and

21  other documents that clearly point to this first tier.

22     Another piece of information that Your Honor needs to know

23  to understand this is the code name "Blue Whale."  That's an

24  internal Microsoft project.  And you can see from this

25  deposition testimony Mr. Ahmed, that the "Blue Whale" is used

1    to build a "Superfresh" index and a "News" index.  That's very

2    important.

3        So whenever you see references to "Blue Whale" throughout

4    our infringement contentions, we're talking about the "Fresh"

5    tier, the topmost tier, not those second and third tiers.

6            **THE COURT:**  You know, on page 12 of your opposition

7    brief, you say, "As support, Looksmart cites documents that

8    explicitly identify News dozens of times."  That's a quote.

9        Your opponents make the point that some of the

10   citations -- some of the documents that are cited -- I don't

11   know why I can't put a sentence together -- that in some of

12   the contentions, you do cite documents that include the word

13   "News," but you cite the pages on which News does not appear.

14       Do you think that happens?  Are you citing to the court,

15   in other words, documents where in the contentions you didn't

16   cite the pages in which News was mentioned?

17           **MR. ENGER:**  That did happen, Your Honor, and we were

18   very clear in the briefing when we were doing that.  When we

19   say that in other pages not cited in the contentions but to

20   the documents that were cited -- and we think that's as --

21   fair to do that because, again, there's asymmetrical

22   information here, Your Honor.

23       Microsoft knows all about its documents and how things

24   work.  We don't.

25           **THE COURT:**  Well, you had the document.  You cited it

1    in your contentions, so my -- so -- well, anyway, I don't want

2    to argue with you.

3         MR. ENGER:  Our contentions do explicitly reference

4    "Blue Whale," "Superfresh" and "Taza" on the pages that are in

5    the contentions, not -- you don't have to go for the documents

6    and find other things.  We think that's sufficient.

7         Again, back to the infringement contentions.  What do we

8    call the accused instrumentality?  It's "Bing."  It's not

9    "News."  It's not "Web."  It's the entirety of Bing, and we

10   specifically call out "Blue Whale."

11        Again, this is other excerpts from the infringement

12   contentions specifically mentioning "Blue Whale,"

13   "Superfresh," and the "Taza" Superfresh index.

14        This is the point where I talk about the unified

15   infringement theory and what the infringement theory really

16   is.  And it's broad enough to encompass, "Web," "News,"

17   "Images," all of them.

18        The claim can basically being distilled down to kind of

19   six steps.  The first is crawling.  And this is a cite from

20   page 7 of the infringement claim charts where we set forth

21   what the theory is as opposed to some of the evidence that

22   supports that theory.

23        You crawl the World Wide Web.  You build an index of

24   pages.  For the -- the page weight -- that's another key part

25   of these claims -- we talk about Bing's static ranker.  Does

1    it matter if we're talking about the static ranker for News

2    versus the static ranker for Web versus the static ranker for

3    Images?  No.  We're pointing -- our theory is static ranker.

4        The same is true of our theory for intrinsic rank.  We say

5    it's "determined by a decision tree."  If Your Honor is

6    unfamiliar with a decision tree, there's a -- a number of

7    inputs that go into it and an output at the end.

8        And we're specifically focused on the way the decision

9    tree combines two of those inputs, and we call them out right

10   here.  This is at the -- page 21 of Exhibit H.  We say it

11   combines static-rank-based feature inputs and content-based

12   feature inputs.  That's the theory.  That other stuff is just

13   implementation details and evidence.

14       For extrinsic rank, here's the theory.  Again, with the

15   decision trees, you combine two different inputs.  You combine

16   the static-rank-based feature inputs, and you combine the

17   anchor-text-based feature inputs, and that's what gives you

18   your extrinsic rank.

19            **THE COURT:**  Do you think it would be fair to observe

20   that save and except for the words "superfresh" "precision"

21   and "recall," that the highlighted portions of this chart

22   describe every search engine that is currently known?

23            **MR. ENGER:**  I don't have perfect knowledge into the

24   way Google, for example, works.  I -- I don't think it uses

25   decision trees.

1          **THE COURT:**  I see.

2          **MR. ENGER:**  I think that's specific to something that

3      would be Bing-related.

4          **THE COURT:**  Okay.

5              (Demonstrative published.)

6          **MR. ENGER:**  Again, combined ranking, whenever you

7      take the extrinsic and entrinsic (phonetic) rank together --

8      again, we're pointing to these decision trees and combining

9      them together.

10      And then lastly, the claim talks about an index database.

11      And what do we say?  We say it's the "Superfresh query results

12      cache," very specific there.

13              (Demonstrative published.)

14          **MR. ENGER:**  Your Honor, what I've done here in this

15      chart is I've compared the charted theory in the middle column

16      with excerpts from Dr. Pazzani's report in the far right

17      column, and I've provided page numbers for Your Honor's

18      reference to identify where this theory appears in

19      Dr. Pazzani's report.

20      And I think if you do that, you will find that the theory

21      is there.  The evidence is different.  No doubt about it.  But

22      the theory is the same.

23      Now, you heard --

24          **THE COURT:**  Ms. Lee, do I already have a copy of this

25      presentation?

1       **MR. ENGER:**  I apologize for not handing these up.

2       One for you and the clerks (handing documents).

3       **THE COURT:**  Thanks.

4       **MR. ENGER:**  You heard Mr. Wolff talk about "Maguro."

5   That was the -- the bottom tier.  And that does not have

6   anything to do with "Fresh" or "Superfresh" or "Taza."  He

7   says we're limited to Maguro.  Not so, I would say.  I would

8   say we were pretty clear that Maguro is just part of Bing's

9   algorithm's.

10      Now, as it's turns out, the theory that we just espoused,

11  and I just showed you where it was, doesn't end up work going

12  for Maguro.  The evidence doesn't support the theory.  So we

13  dropped it.  But the theory was broad enough to encompass

14  Maguro, broad enough to encompass Taza and broad enough to

15  encompass Tiger.

16      Now, I'd like to go back on these two points your -- Your

17  Honor touched on earlier having to do with Microsoft's

18  acknowledgement, and it really goes to prejudice, is really

19  where this fits in.

20      In -- there was no prejudice because Microsoft knew for

21  about six months that News was part of the infringement case.

22  It had six months to develop its non-infringement and its

23  invalidity defenses rel- -- relative to -- to News.  And how

24  do we know that?

25              (Demonstrative published.)

1    **MR. ENGER:**  This is that interrogatory response we

2    pointed to.  And where I've underlined, "Microsoft understands

3    that Looksmart has narrowed its infringement case to focus on

4    Bing News."

5        If Microsoft waited until it got Dr. Pazzani's report to

6    start coming up with those non-infringement defenses about

7    News, well, that's on Microsoft.  That -- that prejudice is --

8    you can't fairly attribute that to Looksmart.

9                    (Demonstrative published.)

10       **MR. ENGER:**  And then here's the stipulation on

11   product -- accused product functionality.  This further shows

12   no prejudice.

13       Again, the stipulation on accused product functionality

14   relates only to Bing News.  There -- there wasn't a

15   stipulation on Bing News and another stipulation on Web and

16   another stipulation on Images.  There was one stipulated

17   (sic), and it had to do with the accused product functionality

18   which is News.  Again, this shows no prejudice.

19       And I told you also a common-sense point that I'd like

20   to -- to advocate, Your Honor.  It has to do with narrowing

21   amendments.  If the law were really as Microsoft suggests, and

22   any time a patent plaintiff wants to narrow its case by

23   dropping functionality or wants to -- learns new evidence and

24   needs to put that evidence in its -- in its case, intends to

25   rely upon in its infringement report, if any -- any time those

1   two scenarios occurred we had to move to amend our

2   infringement contentions, that's all that would -- would

3   happen.  Your Honor, this court would be quagmired in endless

4   motion practice.  The more sensible practice --

5            **THE COURT:**  I already am, but that's okay.

6            **MR. ENGER:**  The more sensible practice, we believe,

7   Your Honor, is that narrowing amendments don't have to be

8   added to the -- you don't have to seek leave to narrow.  You

9   only have to seek leave when you want to expand or add.

10       And the last point that I'll make, unless Your Honor has

11  more questions, has to do with the recent case, the *Phigenix*

12  case that Mr. Wolff discussed.  He's absolutely right, it's

13  unpublished.

14       What it -- what you didn't hear was there's a direct quote

15  that the reason why it was decided the way it was is because

16  the plaintiff, quote, markedly transformed the nature of their

17  infringement theory.

18       I would submit, Your Honor, we have not changed our

19  infringement theory one bit.  We just found out that the

20  evidence didn't support that theory for things other than

21  News.

22            **THE COURT:**  Thank you.

23                 (Pause in the proceedings.)

24            **THE COURT:**  Mr. Wolff, I thought Mr. Enger did a

25  pretty good job given what he had to work with.

1          **MR. WOLFF:**  All right.  Well --

2          **THE COURT:**  So it would be helpful to me -- I know

3    the word "News" is not in the original contentions.  And I've

4    already taken the trouble to go through and look at some of

5    the citations in the contentions and found that pages were

6    cited that didn't mention "News," although they've been

7    brought to my attention in this briefing.  That's why I asked

8    Mr. Enger those questions.

9          But it would be helpful to your cause if you could focus

10   on specific infringement contentions themselves and show why

11   this effort by Looksmart is not a narrowing.

12          **MR. WOLFF:**  Sure.

13          And -- and let me start with one comment to respond to one

14   comment that Mr. Enger made.  He said that in August when they

15   realized their theories did not work for the rest of the --

16   for the rest of the infringement theories, this unified theory

17   for all products, that they stopped pursuing those.  That's

18   not correct.

19          Counsel identified pretty much every deposition transcript

20   of Microsoft witnesses that was taken in this case on

21   technical matters in their briefing.  And the 30(b)(6) notice

22   that -- that's one of their exhibits, too, does not limit it

23   to just News.

24          So they -- I feel a little bit like we were duped the

25   whole time.  They had this grand unified theory that we

1    reasonably understood to (sic) talking about the Web index for

2    how we crawl all the web, when, in fact, really what they were

3    interested in, at least as of August, was only the News but

4    they had us scrambling on all fronts to try to figure out

5    how -- how all this stuff fits in.

6        And before I -- I jump to the contentions, I just want

7    to -- you know, that -- there is an exhibit to our motion that

8    makes this point, that we asked them, if you're narrowing your

9    case to just focus on this instead of just adding this extra

10   theory, amend your contentions.  Tell us exactly what this is,

11   because we want to help prepare our witnesses to what you

12   really care about.

13       There's no doubt they told us that they were going to

14   accuse "News."  And we told them, if you're going to accuse

15   "News," you need to chart it.  You need to follow the Patent

16   Local Rules.  And I'll show you a couple documents for that.

17   But it's Exhibit A and Exhibit B to our -- to our motion.

18   Have email correspondence where we're asking them, what are

19   you going to do?  Are you -- you going to keep all this in

20   play or are you going to narrow your -- narrow your case.

21       But to another -- to another point, I just want to respond

22   briefly.  I mean, I -- what I kind of heard is that it was

23   kind of on Microsoft to force them to amend their contentions.

24   It's -- it's not our burden to do that.  And I just --

25            THE COURT:  Mr. Enger, you don't need to shake your

```
 1    head from side to side.  I know you don't agree with

 2    Mr. Wolff.

 3        Mr. Wolff, go ahead.

 4            MR. WOLFF:  If I could get the ELMO.

 5            THE CLERK:  Yes.

 6            MR. WOLFF:  I think in the -- what am I doing here?

 7                (Demonstrative published.)

 8            MR. WOLFF:  We pointed this out.  We didn't sit back

 9    and just do nothing.  We object each time.  And this is a --

10    the portion of the mediation statement they cited for notice

11    purposes.  We agreed that we -- they -- we could show them --

12    this is our brief -- because you can show that Bird (sic)

13    notice when we looked it up, and it -- it didn't seem that

14    controversial.

15        But we say right there that the theory in the mediation

16    statement about "News" doesn't match the contentions.  It's

17    not there.  So that's back in -- on August -- I'm sorry --

18    October 1st.  That's DI130-16, Exhibit 15.

19            THE COURT:  Case is not likely to be -- motion's not

20    likely to be decided on prejudice grounds.

21            MR. WOLFF:  Okay.  Well -- and I would that Your

22    Honor's that decision's in the *Adobe* case, footnote seven, I

23    think, addresses the prejudice grounds.

24        But we objected each time to their interrogatories when

25    they asked and said, look, you -- you -- in the 130-9, Exhibit
```

```
1   8 -- this is October 19th -- we said, Microsoft objects in the
2   format of substance of the October 1st letter.  It is an
3   untimely and incomplete amendment of Looksmart's infringement
4   theory which is not in compliance with Patent Local Rule 3-1C
5   and 3-6.
6        So I'll move on to the -- to the other stuff 'cause you
7   want to know about the substance here.
8        Could I switch back to the slides?
9            THE CLERK:  Absolutely.
10                   (Demonstrative published.)
11           MR. WOLFF:  So the table that's shown on Slide 9 -- I
12   don't have a copy of these slides, but this is a table that's
13   in our -- in our brief.
14           THE COURT:  It's in the brief.  I have the brief at
15   the bench.
16           MR. WOLFF:  Yeah.  You have the brief.  Its at page
17   4, the opening brief, Docket 143.
18        This shows the difference between what's kind of charted
19   between the contentions and what's identified in the expert
20   report.  And the contentions, that collection of pages is the
21   main line, Web index.  Mr. Enger said that that was only
22   Maguro.  That's not.  We understand that it's Tiger and
23   Maguro, both those indices combined.  Those are the merged
24   indices that make the -- the Web index.  Like I said, before
25   that's ███████████ pages.
```

1    In the expert report for claims one and ten, it's just the

2    pages in the Bing News index.  That's a ███████████████ --

3    ███████████████████████ pages, depending on the -- on what --

4    what's available.

5    For claim 12, it's ████████ pages.  I mentioned this before

6    when I was up here.

7        **THE COURT:**  If I had the chance to say that something

8    was one ████████████████ of something, I would say it more than

9    once, too.  That's okay.

10    **MR. WOLFF:**  I had to look it up to make sure I said

11    it right because I had to do the math and it's -- 'cause I

12    know the scientific notation, so --

13        (Demonstrative published.)

14    **MR. WOLFF:**  The organization of the index, if we look

15    through the charts.  What does the -- what do the charts

16    actually tell us about how the index is organized so what

17    would this convey to Microsoft looking at the charts.  They

18    say its atom-based indexing that uses posting lists.  And a

19    posting list is like a single entry in the book index.  It's

20    got a word, and it's got a link -- or a record locator for all

21    the pages that do it.

22    The expert report doesn't -- it abandons posting lists

23    entirely and this atom-based indexing that's in the Web index,

24    and it just focuses on the ████████████████████ .  The ████

25    ████████ don't work that way at all, so it does create an issue

1    for the way that they're applying the claim terms, too.

2         It affected the way we did our invalidity charting.  And

3    it affected the way that we do our non-infringement defenses.

4         The selection of pages.  The selection of pages that's

5    identified in the contentions is this -- again, they point to

6    the use of ███████████ and this atom-based indexing, and for

7    the expert report, they talk about "███████████."  Could give

8    you a earful of what "██████████" is, but it doesn't work like

9    that.

10        "██████████" is this table like an Excel spreadsheet that

11   has ███████████████████████████████████████████████████████

12   ███████████████████████████████.  And I'm sure nobody

13   followed any of that but me.

14             **THE COURT:**  No, I have it on real-time up here.

15             **MR. WOLFF:**  Okay.

16        But it's just not the same thing.  And there's no

17   explanation in the infringement charts as to how it is that

18   this -- this "██████████" is one of their operative theories.

19                   (Demonstrative published.)

20             **MR. WOLFF:**  For page weight, this is an interesting

21   one.  Definitely relates back to the -- to the motion for

22   summary judgment.  And that is that Bing does have a ██████████

23   █████████████████████████████████████.  But the fundamental

24   difference is that when we're talking about the Web index, and

25   what's cited for the limitation in the charts, is this very

1   compu- -- computationally intense calculation ███████

2   ███████  ███████████████████████████████████████

3   ████████████████████████

4       Mr. Ahmed addresses this in his declaration that was

5   submitted with the summary judgment motion.

6       For the Fresh indexes or the Fresh -- for all the

7   different indexes that are created under the Fresh tier, we

8   don't have that time.  We have ████████████ -- to build

9   the indexes.  And so we can't compute the ranking the same way

10  in the fresh tiers as we do in the web tiers.

11      So, again, when we look at the contentions, there's no

12  ███████████████████████ rank is computed.  It's

13  just they identify ██████████ and all the very complicated

14  computations that are required to be made for that limitation.

15      And in the expert report, their -- plaintiff's expert says

16  ████████ is computed, but then he analyzes it for the web

17  tier, not for the -- for the News index, which is a completely

18  different beast.

19                (Demonstrative published.)

20      **MR. WOLFF:**  And for adjusting the scores, they say

21  that there's some generic math and there's decision trees, but

22  now, when they get to the expert report, they say it's the

23  News ██████.  You won't see any reference to the News ██

24  ██████ in the infringement contentions.  And it -- and it

25  makes a difference.  And it makes a difference because counsel

1   mentioned that they were asking for some ranker files and

2   these ranker files were going to be something special for

3   them.

4      There is a stipulation.  We totally agree there was a

5   stipulation.  That was about discovery, about not taking

6   excess -- more wasteful depositions about how one of these

7   files looked.  I don't want to put up 50 witnesses to talk

8   about how our -- our ranker files look or formated for the

9   last nine years.  That's ridiculous.  I just want to agree on

10  stuff that this looks like the old ones.

11     That's all that stipulation says.  It doesn't say, "oh,

12  everything's hunky-dory here."  We never withdrew our

13  objections to their -- their lack of citation to this theory

14  in their charts.

15     But, again, if you look at the expert report, it talks in

16  detail about the News ████████.  There are over ████

17  ████████ in a ranker configuration file.  The ranker

18  configuration file itself ████████████████ ████████

19  ██████████████████████████████████████

20  ████████████.

21     In the -- In the contentions, there's nothing.  It's just

22  some generic math and decision trees.

23     At the time they knew this in August, why was it

24  Microsoft's burden to go back and force them to amend their

25  contentions?  We objected to what they did.  We told them they

1   needed to do it.  We asked for a specific chart.  We told them

2   their letter was hard to decipher exactly what their theory

3   was.  It doesn't mention any specific claim limitations in any

4   kind of analysis.  It has no enumerated claims that it was

5   going to keep.  And it -- as I mentioned before, we still

6   continued with all the discovery in the case for everything.

7       And to us, it was like, look, this is about indexing the

8   web without limitation to go topic.  And yet, you want us to

9   just look at the News index.  Okay.  We'll give you some

10  discovery on that.  Eventually you'll go away.  But that's not

11  what happened.

12      They just abandoned the other thing and made us defend a

13  case apparently they had no intention of pursuing.

14          **THE COURT:**  Thank you.

15      Mr. Enger, you can have a couple minutes.

16          **MR. ENGER:**  Thank you, Your Honor.  I don't -- I

17  don't think I'll need it, and if we could have that back up on

18  the screen, that would be helpful.

19                  (Pause in the proceedings.)

20          **THE CLERK:**  I switched back.  Was your computer --

21          **MR. ENGER:**  No, to -- to defendant's --

22          **THE CLERK:**  Oh, I'm sorry.

23                  (Demonstrative published.)

24          **MR. ENGER:**  Your Honor, I would submit that a lot of

25  these things that they've had here in their contentions and

1    their expert report, that's not theories.  That's detailed

2    evidence and detailed implementations.

3        The theory is what I told you earlier.  You know, we use

4    these decision trees.  We crawl the web.  We use a static

5    ranker.

6        The specific implementation of static ranker -- you look

7    foe page weight here.  This is the fourth from the bottom,

8    they say we're talking about static rank, but they say, oh,

9    it's only the static rank for Maguro, not the static rank for

10   Taza.  No, the theory is static rank.  And -- and the evidence

11   is how the particular Taza static rank works versus the Maguro

12   static rank.  It -- that's a level of detail that -- it's

13   impossible for a plaintiff to ever know whenever this stuff is

14   all confidential and, you know, hush-hush, how -- how in the

15   world would we ever put that stuff in the -- in the

16   infringement contentions to the level of specificity that

17   defendants would like.  They -- they're always going to ask

18   for more.

19           THE COURT:  Your opponent's point is that the

20   contentions should have been amended.  I don't think he

21   engages with your -- the point you're making now full on.

22   What he would say is you got additional information, you had

23   opportunity to amend your contentions.  That's exactly --

24                (Simultaneous colloquy.)

25           MR. ENGER:  -- new piece of source code, we're

1  supposed to amend our infringement contentions?  As long as

2  it's consistent with the theory and we're not going beyond the

3  theory to add new components, like we did with the query

4  cache -- we knew it was time to amend 'cause we were expanding

5  the theory.

6      But whenever we're just basically finding more evidence

7  that's consistent with the theory, Your Honor, I would submit

8  it's not time to amend at that point.

9          **THE COURT:**  All right.  Thank you all very much.

10  Motion's now under submission.

11          **THE CLERK:**  Court is in recess.

12          (Proceedings were concluded at 3:04 P.M.)

13                          --o0o--

14

15                  **CERTIFICATE OF REPORTER**

16          I certify that the foregoing is a correct transcript

17  from the record of proceedings in the above-entitled matter.

18  I further certify that I am neither counsel for, related to,

19  nor employed by any of the parties to the action in which this

20  hearing was taken, and further that I am not financially nor

21  otherwise interested in the outcome of the action.

22

23          _Raynee H. Mercado_

24      Raynee H. Mercado, CSR, RMR, CRR, FCRR, CCRR

25              Monday, October 14, 2019